CALVIN ROGERS, JR. AND WARREN LEE REED *v.*
STATE OF INDIANA.

[No. 1072S143. Filed September 4, 1974.]

*A. Martin Katz,* of Gary, for appellants.

*Theodore L. Sendak,* Attorney General, *A. Frank Gleaves, III,* Deputy Attorney General, for appellee.

ARTERBURN, C.J.—This case is an appeal from a conviction by a jury for a killing in the attempt to perpetrate a robbery. IC 1971, 35-13-4-1, *Burns Ind. Ann. Stat.* § 10-3401 (1973 Supp.). Appellants raise five (5) issues on appeal. First, Appellants question the sufficiency of the evidence. When the sufficiency of the evidence is called into question, the reviewing court will neither weigh the evidence nor resolve questions concerning the credibility of witnesses. Instead, the Court will look to that evidence most favorable to the State and the reasonable inferences to be drawn therefrom, and the verdict will be affirmed if, from that point of view, there is substantial evidence of probative value from which the trier of fact could reasonably infer that the appellant was guilty beyond a reasonable doubt. *Blackburn* v. *State* (1973), 260 Ind. 5, 291 N.E.2d 686, and cases cited therein. This principle of

appellate review applies to cases, like this one, which involve in some degree or another circumstantial evidence. *McAfee* v. *State* (1973), 259 Ind. 687, 291 N.E.2d 554; *Stice* v. *State* (1950), 228 Ind. 144, 89 N.E.2d 915; *Petillo* v. *State* (1950), 228 Ind. 97, 89 N.E.2d 623. Without this principle the integrity of a jury as the trier of fact would dissolve.

There was testimony at trial which disclosed that at approximately 12:30 a.m. on an August night in 1971, a motorist in Gary heard gunshots and saw a man falling and two other men running to a car. The man seen falling was a security guard at a nearby liquor store. He had been shot, and he subsequently died from the gunshot wounds. The motorist described the car to police who located the car later that morning. A .38 caliber pistol was found on the seat of that car. The bullet which killed the guard had been too damaged for positive identification. However, the ballistic tests did show that the bullet could have been fired from the gun found in the car. Additional testimony revealed that at the time of the shooting five (5) men were out riding around in the car seen by the motorist leaving the scene of the shooting. Appellants were two of these men. The other three occupants of the car were acquaintances of Appellants. The owner and driver of the car, one James Person, testified that earlier in the evening he had given his pistol to Appellant Reed. Eddie Hodge, the fourth occupant of the car, testified that at the scene of the shooting Rogers and Reed had left the car, that the remaining occupants of the car heard gunshots, that he, Hodge, saw Rogers and Reed running toward the car, that Rogers and Reed got back into the car, and the car and its occupants left the area. The fifth occupant of the car, Tavorn, testified that during the time the alleged incident occurred he had passed out from drinking but that he woke up as the car door was closing and then the car drove away. Tavorn further testified that at this time he asked the other occupants what had happened. Tavorn testified that Appellant Reed responded by saying, in Tovorn's words, "they had a shoot-

out." In attempting to clarify, the prosecutor asked Tavorn specifically: "What, if anything, did the Defendant Reed say during the period of time after you woke up and prior to reaching the Yellow Dragon?" The witness Tavorn said: "He just said it was a shootout."

About six months after the shooting, Appellant Reed was arrested in Akron, Ohio. Reed told Akron police officers he was wanted in Gary for murder, and that he was sorry the security guard was dead. Gary policemen went to Akron to pick up Reed. A police officer from Gary testified that on the return trip Reed said to him that "he (Reed) got out of the car to rob" and "a shooting started."

Appellants were charged with killing a "human being . . . while perpetrating or attempting to perpetrate a robbery."

All participants in a robbery or attempted robbery which results in a killing by one of the robbers are deemed equally guilty of the murder, regardless of which participant actually killed the victim. 15 I.L.E. *Homocide* § 18 (1959), and cases cited at F.N. 51. Under these principles, we think the jury could have without manifest irrationality inferred that Rogers and Reed left the car in concert, attempted to rob the security guard and in the course of this attempted robbery one of them shot and killed the guard. Consequently, the verdict of guilty as to both Appellants is supported by substantial evidence of probative value.

The second issue raised by the Appellants is that the trial judge committed prejudicial error in allowing the State to question the witness Person about a prior statement Person had given to the police, and that the trial judge further erred to the prejudice of the Appellants in not giving, during the hearing of evidence at Appellants' request, an instruction limiting the effect of that prior statement to the credibility of the witness Person. However, we think that Appellants have misconstrued the nature of

what transpired at trial. This State's witness, James Person, showed himself to be a hostile witness. A hostile witness may be asked leading questions and may be cross-examined. It appears that the witness Person had made a formal statement which led the prosecutor to believe that he would be an agreeable witness. However, at trial his hostile or adverse attitude soon became apparent as he frequently responded to questions by saying he did not know or could not remember. Thereupon, the State read questions and answers from the prior extra-judicial statement (which was not admitted into evidence) the witness had signed, and asked the witness if he had answered in the manner indicated by the statement. The witness responded to these leading questions in various ways. Sometimes the witness responded, "yes"; sometimes, "no, I didn't"; and once, "I don't remember giving that answer"; and sometimes with an equivocation, such as, "I didn't say it specifically that way, . . . ." It was not an abuse of discretion to permit this kind of questioning of a hostile witness, particularly when, as in this case, he was contradicting himself and making conflicting statements.

The result of this cross-examination was that Person admitted that while riding around in the car with Appellants someone suggested that they rob somebody, that Rogers and Reed got out of the car when they "spotted this man," that Rogers and Reed took Person's gun with them, and that after that Rogers and Reed came back to the car. In other words, Person admitted that he had made a statement that was similar to the testimony of Hodge and Tavorn. Thus, Person's written statement added no new testimony, and we can find nothing prejudicial resulting from the cross-examination using this statement.

Before this questioning got under way the motion at issue was made, by Appellants' attorney, as the following colloquy reveals:

"*By Mr. Work:* He has a right to impeach him, with the right to go through, but I'm asking of the Court that

the Court, before it allows him to go any further with the impeachment, that the Court at this point instructs the Jury that the sole purpose of these questions is to show prior inconsistent statements and that they cannot be the answers to these questions. They cannot be considered by the Jury for any purpose other than to impeach and does nothing. They cannot establish facts on which a verdict could be reached.

*By Mr. Kautz:* The Jury was here at your . . .

*By Mr. Work:* I'm making a motion to instruct the Jury . . .

*By Mr. Nicholls:* The State's position is that instructions by the Court would be proper at the close of the case and would be covered as tendered instructions by either Defendant or the State not at the present time.

*By Mr. Work:* It should be instructed at this time, the Jury should be instructed at this time, as far as my advising of the Jury, you cannot impeach the witness outside of the presence of the Jury. I'll stipulate that you can impeach him right now, without the jury.

*By Mr. Nicholls:* We were trying to get over the preliminaries and get to the gist of the matter.

*By Mr. Senak:* Why does he do it?

*By the Court:* Now, gentlemen, the Reporter cannot hear and take this down if everybody's talking at one time!

*By Mr. Work:* You have your motion and three (3) admonishments.

*By the Court:* That is denied."

Strictly speaking, what was occurring was not a formal impeachment of the witness since it appears that a proper foundation was not laid for the introduction of the allegedly inconsistent prior statement. The witness was being cross-examined as to this prior statement. The questions were directed to obtaining from the witness himself a change or correction of his testimony and such did happen in some instances. The trial judge and the attorneys did not use the term "impeachment" in its strict and formal sense. No impeaching witness was introduced to testify. In short, impeaching evidence was not introduced; therefore, an instruction to limit the effect of such evidence was not necessary. *McAdams* v. *State* (1948), 226 Ind. 403, 81 N.E.2d

671; *Davis* v. *Hardy* (1881), 76 Ind. 272; *Frick* v. *Bickel* (1944), 115 Ind. App. 114, 54 N.E.2d 436.

"It is, indeed, no more than fair that any witness, friendly or hostile, should have his memory aided by the mention of time, place and circumstances, for this mention might often prevent mistakes and keep a witness from departing from the truth. To be sure, it would be subversive of principle to permit counsel, under the guise of refreshing the memory of a witness to suggest the desired answers to a willing or friendly witness; but where the witness is a hostile one, as was Elmer Conway, there is no fear of evil result from suggestive questions.

A hostile witness may, as the authorities all agree, be treated in a very different manner from a friendly one. *The method of examination is almost entirely a matter within the discretion of the trial court, and the appellate court will not interfere unless there was a clear abuse of discretion, leading to manifest injustice. . . ."* (our emphasis)

*Conway* v. *State* (1888), 118 Ind. 482 at 487, 21 N.E. 285 at 286.

Normally a trial is interrupted for limiting or cautionary instructions only when improper evidence has been brought to the attention of the jury. That is not what happened here. What happened here was that Appellant asked for an immediate instruction as to the character of the evidence. A trial is not conducted in that fashion. Instructions as to the weight and effect of the evidence are given, as are other kinds of instructions, to the jury at the close of the argument. We find no error in the action of the trial court.

The third issue which Appellants raise is that the admissions to the police officers by Reed were made without a valid waiver of Fifth Amendment rights. Appellant Reed made the admissions on two different occasions. The first was to Akron police officers. The basis of Appellants' contention as to this incident is that Reed was questioned intermittently over a seven-hour period in a small, windowless room. In response, the State points out that Reed called the police officers back after they had left him in

order to make his confession. On appeal we do not ordinarily disturb a trial court's ruling as to the admissibility of a confession based on conflicting evidence. It was not an abuse of discretion for the trial court to conclude that under the totality of the circumstances the State met its burden of showing that the defendant knowingly and intelligently volunteered the admissions. *Cooper* v. *State* (1974), 261 Ind. 659, 309 N.E.2d 807, 41 Ind. Dec. 507; *Bauer* v. *State* (1973), Ind. App., 300 N.E.2d 364; *Lewis* v. *State* (1972), 259 Ind. 431, 288 N.E.2d 138. Similarly, the admissions to the Gary police officer are not vitiated by the fact that the *Miranda* rights had been read to Reed by the Gary police two days prior to this automobile trip during which the statements occurred, not in response to interrogation, but during casual conversation. The two-day hiatus between the giving of the rights and the occurrence of the admissions does not, standing alone, show that Appellant's will was overbourne. The State carried its burden of proof.

Appellants' next allegation of error is that the trial court erred in admitting into evidence, over objection of Appellant Reed, a social security card seized from Reed in Akron, Ohio. The card was in the name of another person. Assumption of a false name is a form of flight and is therefore relevant as indicative of a consciousness of guilt. *Meredith* v. *State* (1966), 247 Ind. 233, 214 N.E.2d 385; *State* v. *Torphy* (1940), 217 Ind. 383, 28 N.E.2d 70. The car in which Appellant Reed was riding had been stopped for improper license plate display, and the police officers had then noticed in plain view that the car had been hot wired. *Millar* v. *State* (1973), 260 Ind. 368, 295 N.E.2d 814; *Alcorn* v. *State* (1970), 255 Ind. 491, 265 N.E.2d 413; *Bonds* v. *State* (1973), Ind. App., 303 N.E.2d 686. The police then asked for identification, and Appellant responded with the false social security card. Upon viewing the hot wire their request for identification was reasonable investigative activity. *Williams* v. *State* (1974), 261 Ind. 547, 307 N.E.2d 457.

Appellants' final contention is that it was error to allow an Akron police officer to testify after he had violated the Court's order for a separation of witnesses. What had occurred was that during a weekend recess the two Akron police officers had travelled together and conversed about the case. Appellants ·have neither shown nor asserted how they were harmed by this conversation. Therefore, they have not shown an abuse of the trial court's discretionary power to allow a witness who has violated a separation order to testify. *McCoy* v. *State* (1960), 241 Ind. 104, 170 N.E.2d 43 and cases cited therein; *Marine* v. *State* (1973) Ind. App., 301 N.E.2d 778.

For all of the foregoing reasons, the judgment of the trial court is affirmed.

Givan, and Hunter, JJ., concur; Prentice, J., concurs as to Appellant Reed; DeBruler, J., dissents with an opinion in which Prentice, J., joins as to Appellant Rogers.

## DISSENTING OPINION

DeBruler, J.—When, in a criminal or civil trial a witness is asked whether or not he made a certain statement, and answers in the negative or that he does not remember making that statement, no evidence of the facts asserted in the statement has been heard. And when, in a criminal trial, a prosecution witness merely affirms making the statement without also affirming the truth of the facts asserted in the statement, no evidence of the facts asserted in the statement has been heard, which can serve to carry the State's burden to prove a prima facie case. Crucial evidence against the appellant Rogers, which identified him as one of the two men who committed the crime, placed him in the back seat of the getaway car with the appellant Reed, and described him as leaving the car with Reed to rob a man on the street and returning to the car with Reed on the run after several shots were heard fired. This crucial evidence against Rogers came before the jury in the form of a prior statement, given to the

police by the State's witness Person long before the trial, and which statement was read verbatim by the prosecutor before the jury in a long series of questions which took the form of: Were you asked this question . . . and did you give this answer. . . . The witness Person affirmed giving some of the answers which contained assertions of fact incriminating Rogers, and denied giving others, while, on the witness stand he affirmed the truth of none of these factual assertions pertaining to Rogers contained in the prior questions and answers. Since the witness Person did not affirm the truth of the former statement nor the truth of the facts contained in it, his testimony admitting and denying his former statement is not evidence proving those facts. Such testimony is simply incompetent and unfit for the purpose of proving the facts asserted in the statements.

The questions of the prosecutor described above were clearly posed in the impeachment mode. The record shows that the prosecutor demanded and received only "yes" and "no" answers to his leading questions. After asking this series of leading questions and receiving yes and no answers, the prosecutor promptly ended his examination. Thus the leading questions did not refresh the recollection of the witness nor did it cause him to correct any of his testimony. The purpose of permitting leading questions to be put to the forgetful or recalcitrant witness is to refresh his recollection or to cause him to correct his testimony. *Neville* v. *U.S.* (5th Cir., 1959), 272 F. 2d 414; *Hickory* v. *U.S.* (1894), 151 U.S. 303, 14 S. Ct. 334, 38 L. Ed. 170; *Conway* v. *State* (1888), 118 Ind. 482, 21 N.E. 285. The leading questions here were not permitted to serve this purpose which legitimates their use and the discretion of the trial court in permitting them. This case is an example of how the misuse of leading questions can subvert the fairness of a trial.

I would hold in this case, that when a series of leading questions of this nature is asked, and they do not in fact refresh recollection or cause a correction of testimony, the

opposing party in the suit is entitled to an immediate instruction to the jury that such questions are not to be considered substantive evidence. In the case on appeal counsel moved for such an immediate instruction to the jury, but the trial court denied the motion. Because of this erroneous ruling, I vote to grant appellant Rogers a new trial. This remedy is not new or unusual in the law. It is the same technique utilized in cases where prior inconsistent statements are admitted for the purpose of impeachment. *Glover* v. *State* (1970), 253 Ind. 536, 255 N.E.2d 657; *McAdams* v. *State* (1948), 226 Ind 403, 81 N.E.2d 671; *Parker* v. *State* (1925), 196 Ind. 534; 149 N.E. 59; *Bridges* v. *Wixon* (1945), 326 U.S. 135, 65 S. Ct. 1443, 89 L. Ed. 2103. And this same remedy was deemed proper where an illiterate witness' testimony before a coroner's jury was read to him by the prosecution for purposes of refreshing recollection. *Harvey* v. *State* (1872), 40 Ind. 516. And this procedure has been incorporated in Rule 106 of the Proposed Rules of Evidence for the United States District Courts and Magistrates, 1971 Revised Draft. That rule provides:

> "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the judge, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

I would also grant the appellant Reed a new trial because the incriminating statement which he gave to Officer Bravos of the Gary Police while enroute on January 6, from Ohio to Gary, Indiana, was erroneously admitted in evidence. Officer Bravos testified that he went to Ohio to transport the appellant Reed back to Gary, and he arrived in Ohio on January 4, and sought to question Reed who was in the custody of the Ohio police. Under questioning by the prosecuting attorney Officer Bravos testified as follows:

> "Q. Now, you said you had a conversation with the Defendant on that day, namely, January 4th, 1972, at 6 o'clock, p.m., is that right?

A. At that time, yes.

\* \* \*

Q. What questions did you first ask him?

A. I asked him if he had been advised of his rights and he stated yes and that he knew his rights.

Q. After that, you didn't advise him of his rights?

A. Then I advised him of his rights and I pulled out my book and I advised him of his rights again.

\* \* \*

Q. And then what did he say to you, Officer?

A. He stated that he didn't want to talk about the case, that he wanted to get back to Gary and get it over with.

Q. Enroute to the Gary, Lake County area, did you again have a conversation with him in the car?

A. Yes, we were talking in the car.

Q. Did he mention anything about this case to you?

A. Yes, he stated that he got out of the car to rob a man and there was a shootout, a shootout started, and he threw the gun as he turned around and he still kept on running.

\* \* \*

Q. So it was two (2) days later, after, driving to Gary without advising the Defendant of his rights, as to casual conversations with him in the car, that he made this statement to you?

A. I did not advise him of his rights on January 6th, I felt on January 4th was sufficient."

Thereafter defense counsel moved to strike the conversation because of a failure to comply with *Miranda* v. *Arizona* (1966), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694. Once the appellant told Officer Bravos that he did not want to talk about the case, the officer was under a constitutional duty to respect that decision and not to converse with the appellant on that subject. In *Miranda* it is stated:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; *any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.*" (Emphasis added.) 384 U.S. at 473-474.

Under these circumstances, I do not believe that the fact that appellant Reed gave this incriminating statement establishes that appellant voluntarily and intelligently waived his right to remain silent. *Dickerson* v. *State* (1972), 257 Ind. 562, 276 N.E.2d 845; *Nacoff* v. *State* (1971), 256 Ind. 97, 267 N.E.2d 165; *Mims* v. *State* (1970), 255 Ind. 37, 262 N.E.2d 638; *Hall* v. *State* (1970), 255 Ind. 606, 266 N.E.2d 16. The erroneous admission of the second incriminating statement was also not harmless beyond a reasonable doubt. *Chapman* v. *California* (1967), 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705; *Kotteakos* v. *U.S.* (1946), 328 U.S. 750, 66 S. Ct. 1239, 90 L. Ed. 1557; *Vasquez* v. *State* (1970), 254 Ind. 472, 260 N.E.2d 779; *Goodloe* v. *State* (1969), 253 Ind. 270, 252 N.E.2d 788; *Greer* v. *State* (1969), 252 Ind. 20, 245 N.E.2d 158. In the first statement given to Ohio authorities appellant stated that it was his companion who shot the victim of the robbery. It was not until the second statement that he admitted being armed during the robbery. This added fact obviously had substantial influence upon the acceptance by the jury of the State's factual theory which was that the appellant Reed actually shot the victim. As such the erroneous admission of the second statement cannot be considered harmless constitutional error.

Prentice, J., concurs as to appellant Rogers.

NOTE.—Reported at 315 N.E.2d 707.