LUIS MONTES *v.* STATE OF INDIANA.
JOHN D. FARRAR *v.* STATE OF INDIANA.

[No. 174S29 and No. 374S53. Filed August 19, 1975. Rehearing denied October 8, 1975.]

*Robert G. Mann,* of Indianapolis, *David F. McNamar, John Muller,* of Indianapolis, for appellants.

*Theodore L. Sendak,* Attorney General, *John H. Meyers,* Deputy Attorney General, for appellee.

DEBRULER, J.—Appellant Montes was found guilty of second degree murder, Ind. Code § 35-1-54-1, being Burns § 10-3404, and appellant Farrar was found guilty of first degree

murder, Ind. Code § 35-13-4-1, being Burns § 10-3401, in a trial by jury. Each received a sentence of life imprisonment. Their joint trial was conducted by the Honorable Saul I. Rabb. Their appeals to this Court have been consolidated for consideration by us.

Mr. David Doty was employed by the State as houseman to oversee the operation of a work release center located in a house in a residential neighborhood in Indianapolis. He lived in the house along with fifteen inmates of the Indiana Reformatory among whom were appellants Montes and Farrar. Resident inmates were permitted to leave the house to work at jobs in the city and to leave the house on other occasions by special permission. On March 13, 1973, Doty was bludgeoned to death in the center in the early morning hours. The first officer to investigate the crime arrived at the center at 5:30 a.m. and found Doty's body lying in a pool of blood in an anteroom adjacent to the kitchen and back door of the house. He had died of multiple skull fractures and brain damage. An iron bar wrapped in a towel was found next to the body. The checkbook of the victim and gloves bearing bloodstains were found in a garbage can on the back porch.

Appellants were convicted almost entirely upon the confessions which they gave to the police at the police station. The first question raised in this appeal is the admission into evidence of those statements. The surrounding circumstances are these. After the first officer arrived at the house, he was joined by several others. Thirteen inmates, including appellants, were in the house at the time. Two had signed out and were at work. Those two were picked up from work and returned to the house. All fifteen were then perfunctorily interviewed at the house. There, an inmate by the name of Radford informed the police that he had eaten breakfast with the victim before leaving for work that morning at 4:20 a.m., and, at that time, he had seen the appellant Montes coming up the stairs, and that Montes had asked him the time. Appellant Montes confirmed this event and added that he had

asked the time because he had no clock. An examination of Montes' room revealed an electric clock which appeared to be running and in order. Some suspicion was cast upon him by these statements. Appellant Farrar, who was Montes' roommate, stated that he was asleep at the time of the crime. Following this type of brief questioning, all inmates were taken to police headquarters in three or four squad cars.

Appellant Montes was given an advisement of rights at the police station in conformity with the mandate of *Miranda* v. *Arizona,* (1966) 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, at 11:52 a.m., prior to any questioning, and signed an appropriate written waiver. He was questioned off and on until 5:00 p.m., when he gave the police a statement in which he admitted that both he and Farrar had beaten the victim with the bar in order to steal his checkbook and to avoid detection and return to prison. During the afternoon interrogation, he was given additional *Miranda* advisements. During the afternoon also, immediately prior to giving his incriminating statments, he consented to and was given a polygraph examination.

Appellant Farrar was given a *Miranda* advisement in the late afternoon prior to any questioning and executed a written waiver. After consenting to and taking a polygraph test, he was confronted with Montes' confession and admitted his participation in the crime.

At about 7:00 p.m. of the same day, Montes and Farrar were installed in an interrogation room with two of the interrogating officers. The statement of Montes was read aloud to both of them, and, three or four times during the reading, Farrar was asked whether the matter recorded there was true and he replied affirmatively and also offered minor corrections.

The following morning Montes and Farrar were taken to court and presented for the first time to a judge.

At trial, appellants' counsel objected to the admission of their incriminating statements on the ground that such

statements were the product of their illegal arrest or detention. The trial court overruled this objection. Such a contention, if supported, would require the exclusion of the statements. In *Davis* v. *Mississippi*, (1969) 394 U.S. 721, 89 S. Ct. 1394, 22 L. Ed. 2d 676, the U.S. Supreme Court stated the requirement and purposes of such an exclusionary rule:

> "Our decisions recognize no exception to the rule that illegally seized evidence is inadmissible at trial, however relevant and trustworthy the seized evidence may be as an item of proof. The exclusionary rule was fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the Fourth Amendment. To make an exception for illegally seized evidence which is trustworthy would fatally undermine these purposes. Thus, in Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081, (1961), we held that 'all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court.' (Italics supplied.)" 394 U.S. at 724.

When, as here, the rule is invoked by the accused, and no warrant has authorized the police action, the burden is on the state to produce its evidence and prove that the arrest or detention was not illegal by Fourth Amendment standards. *State* v. *Smithers*, (1971) 256 Ind. 512, 269 N.E.2d 874. Or, in the alternative, it must show that "granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at . . . by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun* v. *U.S.*, (1963) 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441, quoting from Maquire, *Evidence of Guilt*, 221 (1959). See also, *Harrison* v. *U.S.*, (1968) 392 U.S. 219, 88 S. Ct. 2008, 20 L. Ed. 2d 1047; *Pirtle* v. *State*, (1975) 263 Ind. 16, 323 N.E.2d 634; *In re Betrand*, (1973) 451 Pa. 381, 303 A. 2d 486; *Commonwealth* v. *Jackson*, (1975) Pa., 331 A. 2d 189.

In Indiana, the Department of Correction is charged by statute with the custody and training of persons committed by the courts to serve sentences of imprisonment in correc-

tional institutions of this State. Ind. Code § 11-1-1.1-1, being Burns § 13-2501. According to Ind. Code § 11-7-9-1 through 11, being Burns §§ 13-140 through 13-151, said Department is required to establish a work-release plan and to promulgate rules and regulations governing its operation. Inmates selected for participation in the plan are released from confinement during the time necessary to travel in the free community to a place of employment, perform their work, and return to quarters designated by the Department. In March, 1973, furloughs from custody of those on work-release status were permitted under certain circumstances for prescribed periods of time. Ind. Code § 11-7-9-10, being Burns § 13-149. While the prisoners in the plan may be quartered in minimum security housing within the free community, they, nevertheless, technically remain inmates of the institution to which they were committed and are in the custody of the Department of Correction. Burns, Rule (13-143)-8, being Dept. of Correction, Rule 8 (1968). An inmate's participation in the plan may be terminated if he "conducts himself . . . in a manner reflecting adversely upon himself, the parent institution or the department of correction." Burns, Rule (13-143)-9, being Dept. of Correction, Rule 9 (1968).

The effect of the police here was to deny to the fifteen men confined in the house, including appellants, the privileges of the work-release program for a period of time sufficient to permit the police to question each man in detail. Weighing in favor of the reasonableness of this restrictive action was the high probability that one of the fifteen had just demonstrated that he would kill for negligible benefit and was therefore in a state highly dangerous, not only to citizens in the neighborhood should he escape the minimum security center, but also to fellow inmates with whom he was locked up in the center. Also, the killing had left the center without its lone resident superintendent at an early hour of the morning. On the other hand, the police have no authority to arrest for the purposes of questioning

absent probable cause sufficient to satisfy the mandates of the Fouth Amendment. Neither do the police have the authority to subpoena witnesses for investigatory questioning, as does a grand jury.

However, we do not decide whether the police action in restricting the work-release privileges of appellants and their fellow inmates was illegal as in violation of rights guaranteed by the Fourth Amendment. We are convinced that, even though the restrictions placed upon appellants be considered illegal, the State carried its burden of showing that the incriminating statements of appellants were not generated by exploitation of any such assumed illegality.

In *Brown* v. *Illinois*, (1975) 422 U.S. 590, 95 S. Ct. 2254, the U.S. Supreme Court held that *Miranda* warnings alone could not serve to attenuate the taint attached to a confession by an unconstitutional arrest. The Court first reminded us of the strong Fourth Amendment side to *Wong Sun, supra:*

> "In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment." (Citation omitted.) 95 S.Ct. at 2261.

The Court reiterated the purpose of the Fourth Amendment's exclusionary rule from *Elkins* v. *U.S.*, (1960) 364 U.S. 206, 80 S. Ct. 1437, 4 L. Ed. 2d 1669:

> "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guarantee in the only effectively available way—by removing the incentive to disregard it." 95 S.Ct. at 2260, quoting from 364 U.S. at 217.

The Court then went on to catalogue the factors to be considered by a court in deciding whether the state had successfully carried its burden of showing that the state

did not obtain the confession by exploitation of an illegal arrest or detention:

> "The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution." (Citations and footnotes omitted.) 95 S.Ct. at 2261-62.

In subsequent parts of this opinion, we determine that while the incriminating statements of appellants were gained in response to custodial police questioning, such statements were, nevertheless, made voluntarily. Appellants admit that each was given an advisement of constitutional rights in accordance with the *Miranda* case, and we hold that each gave a voluntary and intelligent waiver of those rights prior to interrogation. The record establishes that the inmates were prevented from carrying on their normal employment and activities at mid-morning when they were transported to the police station. Farrar was not questioned there at all until late afternoon when he made his incriminating admissions. Montes was questioned intermittently until 5:00 p.m. when he orally incriminated himself. The restrictions upon their activities lasted for about eight hours. During this time they were fed and not mistreated. Montes was given other *Miranda* warnings during the afternoon, and both consented to take polygraph examinations.

The type of "arrest" and the type of custodial detention here is unlike that considered in *Davis* v. *Mississippi, supra,* and *Brown* v. *Illinois, supra.* In those cases, the suspects arrested were private citizens enjoying complete freedom prior to their arrest, while here appellants were taken from a detention center in which their freedom of movement was already severely restricted. And, in those cases, the suspects arrested were subjected to the terror of a detention in a

foreboding place and of uncertain duration, while, in this case, appellants were subjected to an atmosphere in the jail with which they must have been well acquainted, and they knew that their status as inmates, with its resultant confinement, would continue in any event following their making of a statement. Under these circumstances, which included the advisement of the right to remain silent and to have counsel before questioning, we conclude that the police enjoyed no benefit or edge by reason of any assumed illegal arrest or detention. The trial court was correct in finding that the statements were not inadmissible on this ground.

Appellants next contend that their statements should have been suppressed because they were the fruit of an illegal search of the basement bedroom which they shared at the center. Following the interviews with the inmates, the police discovered an alarm clock in that room. This discovery alerted the police to the inconsistency in Montes' statement, and such inconsistency was exploited during interrogation and led to appellants' confessions. As there was no objection or motion to suppress the statements on this ground, and there was no hearing which focused upon the legality of the search of the room, this issue is not presented to us for decision in this appeal. *Hardin* v. *State,* (1970) 254 Ind. 56, 257 N.E.2d 671; *Sargeant* v. *State,* (1970) 255 Ind. 252, 263 N.E.2d 525.

While admitting that the advisement of rights given each appellant met the requirements of *Miranda* v. *Arizona, supra,* appellants contend that their station house statements should have been excluded from evidence because the State failed to prove that their antecedent waivers of rights were voluntarily made. Timely objections to the statements on this ground were made. In *Mathis* v. *U.S.,* (1968) 391 U.S. 1, 88 S. Ct. 1503, 20 L. Ed. 2d 381, the U.S. Supreme Court held that "custodial interrogation," which required *Miranda* warnings, occurred when a person being held in jail on one offense was questioned about an entirely different offense. In

compliance with this requirement, the police did give *Miranda* advisements to Montes at 11:52 a.m. and to Farrar at 4:00 p.m. of the same day. Each executed a written waiver.

In *Nacoff* v. *State*, (1971) 256 Ind. 97, 267 N.E.2d 165, we stated that the standard to be applied in determining the voluntariness of a waiver of rights is the same as that used in the pre-*Miranda* coerced confession cases.

> "The question is whether, looking at all the circumstances, the confession was free and voluntary, and not induced by any violence, threats, promises, or other improper influence." 256 Ind. at 101.

Evidence presented shows that all inmates arrived at the station house in the midmorning. They were fed a noon day meal. None was questioned without an advisement of rights. Appellants were well acquainted with the quality of confinement which they experienced at the jail. The delay in giving advisements was occasioned by having to deal with fifteen separate potential witnesses. This delay, standing alone, does not appear significant. The trial court would have been justified in finding that no improper influences were brought to bear upon appellants prior to their waivers. There is no intimation of any mistreatment by police. The State satisfied its burden of demonstrating that appellants voluntarily waived their rights to remain silent and to consult with counsel.

Appellants objected at trial to the use by the State of their incriminating statements on the grounds that such statements were not given voluntarily. Appellants specifically argue that their wills were overborne by the improper influence of a polygraph examination and by the delay in presentment to a magistrate. Again, we refer to the test in *Nacoff* v. *State, supra:*

> "The question is whether, looking at all the circumstances, the confession was free and voluntary, and not induced by any violence, threats, promises, or other improper influence." 256 Ind. at 101.

The issue of the voluntariness of the statements is to be decided upon a consideration of the totality of the circumstances

surrounding each statement. *Blackburn* v. *Alabama,*
(1960) 361 U.S. 199, 80 S. Ct. 274, 4 L. Ed. 2d 242;
*Smith* v. *State,* (1969) 252 Ind. 425, 249 N.E.2d 493.
We agree with appellants that the use of the lie detector
shown here is a factor which must be weighed negatively in
the determination of voluntariness. The State did not present
testimony describing the conduct of the polygraph examination
or explaining how the conclusions of the examiner were used
in the questioning process. Without this evidence, the possi-
bility that the State tricked appellants into confessing, by
attributing qualities to the test results which did not exist,
has not been dispelled. Prior to submitting to the tests, ap-
pellants claimed innocence. A short time after the testing
period, both confessed.

We likewise agree with appellants that the delay in present-
ment weighs against the voluntariness of these statements.
Both were detained for a period of twenty-four hours
before being presented. Both had been held for at
least six hours at the police station before confessing.
And, after confessing, and being arrested and booked for
murder at 6:00 p.m., both were again interrogated at 7:00
p.m. The evidence established that there was, in the same
building as the jail, a court having criminal jurisdiction, which
was open until 8:00 p.m. Unnecessary delay in presenting a
person to a court, satisfying only the needs of the police for
further interrogation, is illegal. *Nacoff* v. *State, supra; Suter*
v. *State,* (1949) 227 Ind. 648, 88 N.E.2d 386; Ind. Code
§ 35-5-5-3, being Burns § 9-1636.

In this case, however, there are other circumstances against
which these two negative factors must be weighed. Most
significant among them is the compliance with the require-
ments of the *Miranda* case. Prior to questioning, appellants
were given an admittedly complete advisement of rights, and
they did in fact execute a voluntary and knowing written
waiver of the right to remain silent and to have assistance

of counsel. Both freely chose to subject themselves to questioning. As to Montes, these advisements were given more than once during the four hours of interrogation in the afternoon. Prior to the polygraph examinations, each appellant was asked to give his consent to such examination and in fact did do so.

Appellants knew that they were to be questioned as suspects about a probable homicide at the center. They were of mature age and were not likely to be frightened by being taken to jail and held along with their fellow inmates. Here there were no prolonged sessions of interrogation, over an extended period of days, found excessively coercive in *Davis* v. *North Carolina,* (1966) 384 U.S. 737, 86 S. Ct. 1761, 16 L. Ed. 2d 895. The surroundings in which appellants were confined were not small and oppressive. *Nacoff* v. *State, supra.* There were no police threats directed at appellants or their loved ones which would have overborne their will. *Hall* v. *State,* (1971) 255 Ind. 606, 266 N.E.2d 16. They were not denied necessary food or sleep. Ind. Code § 35-22-5-1, being Burns § 10-404. There is no suggestion in the case that the interrogation by police officers was conducted in a manner likely to have generated fear in the minds of appellants.

In *Watts* v. *Indiana,* (1949) 338 U.S. 49, 69 S. Ct. 1347, 93 L. Ed. 1801, the Supreme Court stated:

"A confession by which life becomes forfeit must be the expression of free choice. *A statement to be voluntary of course need not be volunteered.* But if it is the product of sustained pressure by the police it does not issue from a free choice. When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary." (Emphasis added.) 338 U.S. at 53.

Here, it is recognized that a confession is not per se involuntary because it is given upon questioning by police. Accord, *Schneckloth* v. *Bustamonte,* (1973) 412 U.S. 218, 93 S. Ct. 2041,

36 L. Ed. 2d 854. Appellants freely chose to relinquish their right to remain silent and chose to subject themselves to the verbal inquiries of the police. So long as verbal inquiries involve no threats, promises, falsehoods, or the like, but are direct statements probing the suspect's knowledge of relevant events, including inconsistencies in answers given, they do not, without additional circumstances indicating compulsion, result in involuntary divulgence of information. Here we have such direct verbal inquiry, accompanied by two circumstances which indicate a degree of compulsion, namely, the unexplained use of the lie detector test and its results by the interrogator and the delay in presentment.

Having viewed the totality of the circumstances surrounding the statements, we conclude that, in spite of the negative weight given the two factors discussed above, the State carried its burden of demonstrating that the statements were not taken in violation of the guarantee of the Fifth Amendment against compulsory self-incrimination or of that due process of law which the Fourteenth Amendment guarantees.

At trial, appellant Montes objected to the admission of Farrar's statements as hearsay and as denying him the right to confront the witnesses against him guaranteed by the Sixth Amendment to the United States Constitution and by Art. 1, § 13, of the Indiana Constitution. Appellant Farrar made the same objection to the admission of Montes' statements. Neither appellant did testify. The statements of each implicated the other. The objections were overruled.

In *Pointer* v. *Texas*, (1965) 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923, the U.S. Supreme Court held that "the Sixth Amendment's right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment." In *Bruton* v. *U.S.*, (1968) 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476, that Court held that the right to cross-examine secured by the

Sixth Amendment was abridged, when a defendant, in a joint trial, was faced with the confession of a co-defendant which inculpated him and cross-examination was impossible because the confessing co-defendant did not testify. Here the circumstances are different. We do not have a case in which one defendant had confessed, and the other had not. At the 7:00 p.m. joint interview, Farrar considered and adopted the full statement of Montes. The statements admitted into evidence were at once those of both appellants, and, as such, were admissible within the exception to the hearsay rule for admissions by a criminal defendant or a party, McCormick, EVIDENCE, § 145, and did not place appellants individually in a perilous position from which cross-examination could serve to extricate them. *U.S.* v. *Spinks*, (7th Cir. 1972) 470 F. 2d 64; *U.S. ex rel. Catanzaro* v. *Mancusi*, (2nd Cir. 1968) 404 F. 2d 296. The admission of the statements did not transgress rights protected by either of the constitutional provisions relied upon.

Appellant Farrar points out that there was no jury instruction given to the effect that the statements of Montes should be considered only for the purpose of determining Montes' guilt. Montes makes the same complaint about the inadequacy of jury instruction. Suffice it to say that the statements of both appellants coalesced into one during the joint interview mentioned, and therefore there was no need for the trier of fact to consider them separately. The requirement of such a jury instruction was not applicable in this case. It is quite likely that trial counsel considered such an instruction unnecessary, since they made no objection to the court's instruction on this basis, nor did they tender any *Bruton*-type instruction.

The indictment charged that appellants "did then and there unlawfully, feloniously, purposely, and with premeditated malice kill and murder David L. Doty . . . by then and there unlawfully, feloniously, purposely, and with premeditated malice beating at and against the head of the said David L. Doty with a certain blunt instrument, the exact nature and

description of which is unknown to the Grand Jurors, said blunt instrument being then and there held in the hands of the said John D. Farrar and Luis A. Montes. . . ." Appellant Montes claims that a fatal variance between the proof and the charge was created when the trial court over objection admitted into evidence the iron bar and Montes' statement referring to the iron bar. The evidence indicated that the iron bar found next to the body was the murder weapon and that it was wrapped in a towel. Montes argues that the iron bar admitted into evidence is so different from "a certain blunt instrument, the exact nature and description of which is unknown to the Grand Jurors" as to create a fatal variance, since there was no evidence that the grand jury did not know its exact nature and description. The iron bar wrapped in a towel admitted into evidence conformed substantially to the description in the indictment. If there was a variance here, we see no possibility that it misled appellant in preparing his defense. The evidence was not inadmissible on this ground.

Appellant Montes argues also that the evidence was insufficient to prove a material allegation in the indictment, namely, the allegation that the victim was killed with a blunt instrument, the exact nature of which was unknown to the grand jury. Appellant relies upon the cases of *Gipe* v. *State,* (1905) 165 Ind. 433, 75 N.E. 881, and *Rice* v. *State,* (1936) 211 Ind. 496, 5 N.E.2d 512. Appellant argues that the State failed to prove that the grand jury was unaware of the exact nature of the blunt instrument used to kill the decedent. We agree that where the means of committing a homicide are expressed in the indictment, the State must prove that death occurred through those means. The indictment charged that death occurred as the result of a beating with a "blunt instrument." The evidence at trial indicated that the blunt instrument was the iron bar wrapped in a towel, and this evidence substantially corresponded with the allegation that a "blunt instrument" was used. Here the allegation that the grand jury lacked precise knowledge was made in conjunction with

a statement describing the express means used, namely, "a certain blunt instrument," but at the same time the indictment did not describe the nature of the blunt instrument. It was therefore unnecessary for the State to prove that the grand jury lacked such knowledge, as that was not a material allegation.

The convictions are affirmed.

Givan, C.J., Arterburn and Prentice, JJ., concur; Hunter, J., concurs in result.

NOTE.—Reported at 332 N.E.2d 570.