RAUL RUDY SOTELO v. STATE OF INDIANA.

[No. 475S89. Filed March 12, 1976.]

*A. Martin Katz, Katz & Brenman,* of Merrillville, for appellant.

*Theodore L. Sendak,* Attorney General, *Joseph J. Reiswerg,* Deputy Attorney General, for appellee.

ARTERBURN, J.—The Appellant, Raul Rudy Sotelo, of Gary, Indiana, was convicted on October 2, 1974, of the first degree murder of one Carrie Louise Duncan. A motion to correct errors was filed with the trial court on December 9, 1974. It is from the denial of this motion on January 14, 1975, that the Appellant presents this appeal.

The evidence at trial revealed that at about 7:40 a.m. on September 27, 1973, the Appellant borrowed the automobile of a co-worker, Alberto Alverez, explaining that he did not feel well. Shortly after 8:00 a.m. the Appellant offered a ride to a friend, Adrian Martinez, who was walking from his home to the high school he attended. The two drove around for some time and went to the home of one John Jacquez. Jacquez was not home at this time, but was found there when the Appellant and Martinez returned a short time later. Jacquez joined his two friends in their drive.

At approximately 9:30 a.m. or 10:00 a.m. the Appellant and his two passengers came across two girls walking along the street. One of the girls, Carrie Louise Duncan, the deceased, accepted a ride with them, while the other proceeded to her home. The Appellant and his three passengers drove to an isolated area of Ridgelawn Cemetery in Gary and stayed there approximately five minutes. They then drove to the home

of Nini Badillo. The evidence revealed that Carrie Louise Duncan was at this time twelve years old.

Upon their arrival at the home of Nini Badillo, the Appellant and the deceased went into one of the bedrooms of the home for some twenty minutes. Their companions watched television. The Appellant, around 12:00 noon, announced that he was taking the victim home and left with her. He returned alone some ten to twenty-five minutes later.

The body of the deceased was found later that afternoon at Ridgelawn Cemetery. The partially-clad body showed a number of wounds. Articles of clothing were strewn around the scene of the crime.

After first denying any wrongdoing, the Appellant confessed to the killing. His rendition of events following his departure with the victim from the Badillo home is as follows:

"On Thursday, Sept. 27, 1973 the same things occurred as I had told you in the first statement I signed earlier in the day. Everything was true up till the time I left Nini's house with Carrie, and I said I had dropped her off at 8th & Mathews St., but, I did not drop her off at her house. When we Carrie and I got to 8th & Mathews St., she did get out of the car. Then when I started backing up, she got back into the car. And I drove to Clark Rd., and then south toward Ridge Rd. At this time, she said I could have sex with her if I gave her $50.00 now and $100.00 later. She said she needed money to buy a dress for a wedding, and a bike tire. While I was driving south on Clerk Rd., she was taking off her clothes. I then told her I would give her some money, but that I did not have any money now. Then we drove into the Ridgelawn Cemetery, and I drove back to the wooded area on the west end of the cemetery. At this time, she only had her socks and tennis shoes on. We were listening to some tapes, and she was laying with her hed in my lap. She then said she wanted $50.00 now, or she was going to tell my wife and the Police. I told her I could not get the money, and she got out of the car, and put her clothes on the hood. She started getting dressed, putting on her bra and shirt. So at this time, I got scared and backed up, and pushed the gas, and ran over her. I then backed over her, and then drove over her again, and then backed over her a second time, and then took off. I then

went back to Nini's house, and picked up Adrian and Nini, and drove around like I said in the first statement. This is the true statement of what happened."

We consider first the admissibility of this confession.

## I.

The Appellant urges error in the admission of his confession into evidence on two grounds. First, it is asserted that the Appellant was not sufficiently advised of his rights under *Miranda* v. *Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Second, it is contended that police conduct in the administration of a lie detector test of the Appellant was fraudulent and coercive, rendering the confession involuntary and inadmissible.

The waiver of rights signed by the Appellant which gives rise to the first contention reads as follows:

"I, Raul Rudy SOTELO, am 18 years old. My date of birth is November 2, 1954. I live at 1125 Dallas Street, Gary, Indiana. The person to whom I give the following voluntary statement, D. Kasper, D. Longfellow having identified and made himself known as a Detective of the Lake County Police Department, DULY WARNED AND ADVISED ME, AND I KNOW:

1. Before making this statement, I was advised that I have the right to remain silent and that anything I might say, may or will be used against me in a court of law.

2. That I have the right to consult with an attorney of my own choice before saying anything, and that an attorney may be present while I am making any statement or throughout the course of any conversation with any police officer if I so choose.

3. That I can stop and request an attorney at any time during the course of the taking of any statement or during the course of any such conversation.

4. That in the course of any conversation, I can refuse to answer any further questions, and remain silent, thereby terminating the conversation.

5. That if I cannot hire an attorney, one will be provided for me."

The Appellant finds error in the words "of my choice" in Section 2 and the words "may or will" in Section 1. "Of my choice" is said to create ambiguity regarding the appointment of counsel prior to interrogation since one only has a choice of counsel when he can afford it. It is thus implied that pauper counsel is not possible at that time. "May or will" is found deficient in that it should be more emphatic. It should read "can and will."

In *Jones* v. *State*, (1969) 253 Ind. 235, 252 N.E.2d 572, this court discussed the adequacy of the wording of such advisements. We quoted with approval *Coyote* v. *United States* (10th Cir. 1967) 380 F.2d 305 at 308:

> "Surely Miranda is not a ritual of words to be recited by rote according to didactic niceties. What Miranda does require is meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act. We will not indulge semantical debates between counsel over the particular words used to inform an individual of his rights. The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated impart a clear, understandable warning of all of his rights.
>
> "It is, of course, always open to an accused to subjectively deny that he understood the precautionary warning, and advice with respect to the assistance of counsel. When the issue is raised in an admissibility hearing, i.e., see McHenry v. United States 10 Cir., 308 F.2d 700, it is for the court to objectively determine whether in the circumstances of the case the words used were sufficient to convey the required warning."

An extensive hearing on the Appellant's motion to suppress the confession was held by the trial court. Evidence, including a tape recording of the Appellant's interrogation, revealed that the Appellant was orally advised of his rights in addition to having the waiver form presented to him. That oral advisement did not contain the language complained of in the written form. It simply said, in part, that anything said "can" be used against him in a court and that he had a right to an

attorney. Testimony at the suppression hearing also revealed that prior to interrogation the Appellant was asked if he understood the waiver form he was reading. He replied that he did because he had been arrested before.

. The waiver form used by police here is not on its face ambiguous or misleading. A common sense reading does not lead to the Appellant's conclusions of ambiguity. Moreover, evidence heard at the suppression hearing clearly established that the Appellant was not subjectively misled. There is sufficient evidence on the record to support the trial court's conclusion that the Appellant's confession was knowingly given.

The Appellant's contention that his confession was involuntary revolves around his submission to a polygraph examination on the night of his confession. The Appellant told police that he wished to take a polygraph test to show he was truthful. It is contended that the administration of this test amounted to actual or psychological coercion. This court recognized the potentially coercive effects of polygraph examination in *Montes* v. *State*, (1975) 263 Ind. 390, 332 N.E.2d 786. We wrote at 792-793:

> "We agree with appellants that the use of the lie detector shown here is a factor which must be weighed negatively in the determination of voluntariness. The State did not present testimony describing the conduct of the polygraph examination or explaining how the conclusions of the examiner were used in the questioning process. Without this evidence, the possibility that the State tricked appellants into confessing, by attributing qualities to the test results which did not exist, has not been dispelled. Prior to submitting to the tests, appellants claimed innocence. A short time after the testing period, both confessed."

Unlike *Montes* v. *State, supra,* the trial court in this case was presented with a complete record of the polygraph examination. The test had been videotaped and the recording and a written transcript of it were presented to the trial court. The record reveals no flagrant misstatements to the Appellant

of the test results. The complained of examiner repeated his interpretation before the trial court. An expert called to dispute that interpretation admitted that differences of professional opinion are not uncommon. The record also reveals no blatantly coercive interrogation. The Appellant was certainly coaxed into making his admissions. A reading of that interrogation, however, does not necessarily give rise to conclusions of coercion.

This court will not disturb a trial court's ruling on the admissibility of a confession when that ruling is based on substantial evidence, even though conflicting with other evidence. *Rogers* v. *State,* (1974) 262 Ind. 315, 315 N.E.2d 707; *Cooper* v. *State,* (1974) 261 Ind. 659, 309 N.E.2d 807. As with the issue of the knowing nature of the Appellant's waiver of his rights, the trial court was presented with ample evidence upon which it could conclude that the confession was voluntary. We can therefore find no error in the admission of the Appellant's confession into evidence.

## II.

The Appellant also contends that the verdict of the jury regarding the sanity of the Appellant was not supported by sufficient evidence. The issue of sanity is one to be determined by the trier of fact and one for which the State bears a burden of proof beyond a reasonable doubt. This court in *Blake* v. *State,* (1975) 262 Ind. 659, 323 N.E.2d 227, stated the standard of appellate review to be followed:

"We have recently reiterated that the question of insanity is a question of fact not unlike other factual issues, which are to be decided by the trier of fact. Whenever such a factual question is appealed, this Court does not weigh the evidence nor judge the credibility of witnesses. We look to the evidence on the issue most favorable to the state and the reasonable inferences to be drawn therefrom. When there is substantial evidence of probative value to support the decision of the

trier of fact, the decision will be affirmed. Dragon v. State, (1974) 262 Ind. 394, 316 N.E.2d 827; Moore v. State, (1973) 260 Ind. 154, 293 N.E.2d 28; Majors v. State, (1974) 160 Ind. App. 124, 310 N.E.2d 283."

The Appellant presented six witnesses in support of his plea of not guilty by reason of insanity. Called by the trial court to testify were two physicians appointed to examine the Appellant pursuant to Ind. Code § 35-5-2-2 (Burns 1975). These witnesses presented the evidence upon which the Appellant's sufficiency argument is based.

Lay testimony by four witnesses—the Appellant's mother, sister, wife, and a former school classmate—established a pattern of emotional distress following the death of the Appellant's father when the Appellant was nine years old. The Appellant was subject to frequent outbursts of anger and a desire to be alone much of the time. The Appellant on occasions beat his mother, sister, and wife.

Two expert witnesses were also called by the Appellant to testify. The first, a psychologist, testified regarding psychological tests he administered to the Appellant. Indicated, he concluded, was a diagnosis of paranoid schizophrenia. The second expert, a psychiatrist, testified that he examined the Appellant and concluded that on September 27 the Appellant was suffering from a mental disorder which made him unable to determine the wrongfulness of his act. The disorder was diagnosed as chronic and differentiated schizophrenia. It was his opinion that the Appellant's psychotic condition at the time of the crime also rendered him unable to conform his conduct to the requirements of the law.

The two psychiatrists appointed by the court did not go so far as to diagnose the Appellant's precise mental disorder. It was the conclusion of each physician, however, that the Appellant was at the time of the crime, unable to conform his conduct to the requirements of the law and was therefore legally insane.

Against this evidence the jury considered other evidence of sanity on the part of the Appellant. First, as the brief of the Appellee points out, "there was considerable testimony by persons who were in the presence of the defendant immediately preceding the commission of the murder and immediately following the commission of the murder. All such testimony was that the defendant appeared cool, normal and did not appear to be acting in any manner other than normal." While the Appellee's brief neither points to the parts of the record where such testimony exists nor names the witnesses so testifying, our review of the record indicates that this was the case.

A second factor indicating sanity on the part of the Appellant when this crime was committed was the Appellant's description of the crime in his confession. He simply admitted that he "got scared and backed up, and pushed the gas, and ran over her." The witnesses called by the defense established a pattern of physical violence evidenced by beatings and possible loss of memory. The jury could have determined that this crime did not fit into this established pattern.

Third, testimony by police officers revealed that on two occasions the Appellant exhibited anger without any physical violence whatsoever. The Appellant, after his first interrogation, was told he was being placed under arrest. He turned red, shouted, cursed in both English and Spanish, but exhibited no attempt at physical force. Similarly, when the Appellant's wife was arrested for disturbing the peace by talking to the Appellant from outside a window of the jail, the Appellant became angry with no sign of physical violence.

The jury in this case chose to interpret these events as inconsistent with the Appellant's claim of insanity. We cannot weigh the evidence, nor can we judge the credibility of the witnesses. Accordingly, we can only find that there was sufficient evidence to support the jury's verdict.

### III.

The Appellant also finds reversible error in the admission into evidence of State's Exhibits 6 and 7, color photographs of the body of the victim at the scene of the crime. He argues that these photographs were gruesome and shocking and that there were numerous black and white photographs depicting the same subject matter available to the State.

The Appellant has failed to show prejudice resulting from the admission of the photographs. His primary rationale in support of his position—that a number of black and white photographs virtually identical to the color ones could and should have been used—is also his undoing. Several such photographs were admitted. The black and white photographs entered without objection into evidence by the State and those entered into evidence by the Appellant himself are no less gruesome than those questioned here.

Indeed, the essence of the Appellant's argument appears to be that color photographs are more gruesome than black and white photographs. This was not the case here and certainly cannot stand as a general principle of law. Moreover, the Appellant does not contend that these photographs are not a true representation of what they portray. The fact is that a color photograph, properly processed, should be more true and accurate in its representation than a black and white photograph.

"One can hardly conceive of a more gruesome and disagreeable picture than that of a decomposed body of the victim of a homicide found lying in weeds with the skull and bones showing, as was true in *Hawkins* v. *State*, (1941) 219 Ind. 116, 37 N.E.2d 79. The same objection was made there as here, namely that its introduction inflamed the jury emotionally and prejudiced the defendant. The court analyzed the law, citing Wigmore and stated that where oral testimony is competent to describe the facts, a picture is competent to describe the same details, regardless of how gruesome, horrible and revolting the picture may be. See also: *Denson* v. *State*, (1960) 240 Ind. 324, 163 N.E.2d 749.

\* \* \*

"The mere fact that evidence is injurious (i.e. prejudicial) to a defendant does not for such reason make it incompetent or inadmissible, if relevant. As a matter of fact, all evidence which is relevant and presented by the State or a party in a law suit is prejudicial. It is introduced for the very purpose of influencing the jury. It is only when evidence is irrelevant, regardless of its damaging (i.e. prejudicial) nature, that it becomes inadmissible.

"The fact that the details of a murder may be gory, revolting or inflammatory when presented to a jury is no grounds for excluding such evidence, as revealed by the cases cited above. No crime is a 'tea party.' Life is real, and the jury is entitled to all the details of the acts of a defendant relating to the crime. No defendant in a criminal case is entitled to have the revolting, inflammatory and gory details relating to the crime excluded, if evidence shows he participated in the activities and brought about such a condition. To hold otherwise would be to throw a cloak of protection about those guilty of horrible, revolting and gory acts which they themselves create."

*Meredith* v. *State,* (1966) 247 Ind. 233 at 237-238, 214 N.E.2d 385 at 387-388. The photographs here were relevant ■ and accurate. We can find no error in permitting the jury to see them.

The judgment of the trial court below is affirmed.

Givan, C.J., Prentice, J., concur; DeBruler, J., concurs in result with opinion; Hunter, J., concurs in result with opinion.

### CONCURRING OPINION

DEBRULER, J.—I agree with the view of the Court that there was sufficient evidence of sanity to support the jury's decision here. There is evidence that appellant was eighteen years old, an employee of U.S. Steel, and that on the day of the killing, he, in concert with friends picked the victim up, and took her to his apartment. They engaged in conversation and had an ordinary human encounter during the apartment visit. In the car, the appellant sought to convince the victim to have sexual relations with him, and being unable to do so, became angered and enraged by reason of his frustrated

expectations. In this state of anger, he struck out at the victim, with the means at hand, namely, the automobile. He had violently attacked women in his life before when they did not meet his expectations. It seems to me that the jury would have been warranted in concluding from this evidence, and that stated in the majority opinion, that appellant's attack upon the victim was the product of anger and frustration engendered by being denied what he wanted from a person he considered weaker and inferior, and that such a violent and infantile reaction, tragically resulting in death, was the act of a sane person and was causally unconnected to any mental disease or defect.

I do not however agree that the precautionary warnings given to appellant prior to his confession conformed to the requirements of *Miranda* v. *Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

Appellant's counsel points out the defect in this form in his brief. There he contends:

"The printed material in this form is ambiguous, failing to adequately inform most suspects that they have the right to an appointed attorney prior to any questioning. Part of this deliberately calculated effect was achieved by adding the words 'attorney of your own choice' to the first part of the advisement form. This would mean to many that they could have an attorney of their own choice to consult with them before they made a statement, just as it reads on the Lake County Waiver Form, but that this only applies to an attorney of their own choice, assuming they could afford one.

The form then continues on to advise the individual that an attorney may be present while he is making any statement or throughout the course of any conversation with any police officer if he chooses. The person of course still has the attorney of his own choice in mind, and if he cannot afford one, this thought passes him by and is discounted as not being applicable to him. He is then advised that he can stop and request an attorney at any time during the course of the taking of any statement or during the course of any such conversation. Again, if the person cannot afford an attorney of his own choice, this further possibility is discounted as not being applicable to him.

The right to refuse to answer any further questions and to remain silent is then listed, followed by an advisement that if the person cannot hire an attorney, one will be provided for him. The interrogation process is immediate and impending, and this last advisement on the waiver form would naturally lead a person to believe that he may have an attorney appointed for him some time in the future, and not prior to interrogation. It is not common knowledge that a person has the right to an appointed attorney at the police station prior to police interrogation, and the waiver form signed by the defendant in the within cause does little to inform the individual of this right. As mandated by *Miranda*, supra, the individual must be clearly advised of his rights, and not required to ask whether or not he has the right to an appointed attorney prior to questioning."

The precautionary warnings do not clearly tell the person about to be questioned that if he has no money to hire a lawyer, one would be provided for him prior to any questioning, and that he could consult with that lawyer and have him present during questioning. It is the absence of such a clear statement which condemns these warnings as constitutionally inadequate.

However, I concur in the affirmance of this conviction in spite of the erroneous admission of this statement, because within the setting of this case the admission of the statement is so insignificant and unimportant as to be consistent with the Federal Constitution. *Chapman* v. *California*, (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. At the time the State rested its case-in-chief, a prima facie case had been made by the State without the confession, and so the appellant was not required to go forward with his defense as a result of the statement being in evidence. When considered at that point in the trial, the erroneous admission was harmless beyond a reasonable doubt. And then, when considered at the end of the entire trial, that confession must be deemed harmless beyond a reasonable doubt, because of the testimony of the expert witnesses who testified on the issue of sanity. Appellant's statements to them were entirely corroborative

of and consistent with the statement erroneously admitted in evidence during the State's case-in-chief.

CONCURRING OPINION

HUNTER, J.—This case presents a special plea of not guilty by reason of insanity. The legal standard by which appellant's plea must be judged is the alternative formulation of the Model Penal Code, Section 4.01, adopted by this Court in *Hill* v. *State,* (1969) 252 Ind. 601, 251 N.E.2d 429. Section 4.01 provides:

> "(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.
>
> "(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

A legally defensible application of this standard requires the trier of fact to make at least four determinations in the accused's favor before his plea may be upheld. The initial determination is whether the defendant, prior to the act for which he stands charged, was suffering from a mental disease or defect. In this determination the jury is negatively instructed that a mental disease or defect does not include "an abnormality manifested only by repeated criminal or otherwise antisocial conduct." If the trier of fact concludes that the defendant prior to the crime suffered a mental disease or defect, it must further determine whether the operation of the disease or defect on the mind of the accused substantially diminished his mental capacity. Next, the trier must determine whether the accused, at the time of the crime, still bears the scars of the disease or defect, i.e., whether his mental capacity remains substantially diminished. Finally, the trier must decide whether this mental debility rendered the accused unable to appreciate the wrongfulness of his conduct, or if

he could appreciate its wrongfulness, nevertheless, he was unable to conform his actions to the requirements of the law.

The defense of insanity is premised upon the notion that criminal sanctions serve as no deterrent and should not be imposed upon one who is unable to conform his conduct so as to avoid the imposition of such sanctions. This premise did not always obtain; until the thirteenth century insane persons were routinely held accountable for their criminal acts, with their affliction being considered only as a basis for pardon. *See* Perkins, CRIMINAL LAW 850 (1969). Contrary to popular mythology, a defendant who is insane at the time the offense is committed and pleads insanity as his defense is more likely to go to jail than go free. Our law of insanity, which is based upon an arguably enlightened premise, operates much like the law of the thirteenth century, but without the candor of those earlier times. Since a defendant's guilt or innocence turns upon his state of mind when the crime was committed, he is necessarily entitled to have a jury pass upon his mental condition. Thus, while a defendant may be insane for purposes of medical treatment, the question of whether the same condition renders him insane for purposes of relieving him of criminal responsibility is a question of fact to be decided solely by the trier of fact. *Blake* v. *State,* (1975) 262 Ind. 659, 323 N.E.2d 227. Expert testimony in the area of insanity—as with other questions of fact—is not entitled to special weight and competes on the same plane with the weakest of lay testimony. *Riggs* v. *State,* (1976) 264 Ind. 263, 342 N.E.2d 838; *Moore* v. *State,* (1973) 260 Ind. 154, 293 N.E.2d 28.

Initially, expert medical testimony was viewed with distrust because of the imperfect state of the art and the forces of anti-intellectualism which viewed such testimony an as affront to the common sense of the jurors:

> "We will not attempt to discuss the different announced classifications of insanity—with them we have nothing to do. Their technical names and nice theoretical distinctions have

long enough confused courts and cast contempt upon the verdict of juries. Insanity is a disease. The effect it has produced upon the faculties of the reason and will are all we are concerned with. It is no more the province of a court to instruct a jury as to the effect this disease will produce in a special subject, than as to the results of an attack of cholera or fever. The effect which has been produced is a question of fact, and to be proved in like manner." *Bradley* v. *State,* (1869) 31 Ind. 492, 509.

Medical advances in the discovery and treatment of mental disease since 1869 merely affect the weight of the expert testimony and do not compel its acceptance by the jury. Appellant, if he is able, may well ponder the justice of a system which finds him guilty when the testimony of three psychiatrists and one psychologist was uniform in conclusion that he was unable to conform his conduct to the requirements of the law. Perhaps he will find solace in knowing that the same system would not have precluded his use of lay testimony to rebut expert testimony had it not been in his favor. In any event, under the present law of insanity, appellant's conviction must be affirmed, because there was *some* evidence from which the jury could find that he was able to conform his actions to the law, but declined to do so when he committed the crime.

The foregoing does not mean, however, that justice has triumphed in this case.

NOTE.—Reported at 342 N.E.2d 844.