Maria Hermelinda **MONTOYA**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 25028.

United States Court of Appeals Fifth Circuit.

March 28, 1968.

732

Donald F. Frost, Miami, Fla., for appellant.

Michael J. Osman, William A. Daniel, Jr., Asst. U. S. Attys., Miami, Fla., for appellee.

Before TUTTLE and GOLDBERG, Circuit Judges, and HOOPER, District Judge.

TUTTLE, Circuit Judge:

Maria Montoya and a male companion, Heriberto Lozano were arrested on April 2, 1967 in Dade County, Florida very shortly after they arrived from Colombia by air and were charged with importation and illegal purchase of some two thousand grams of cocaine, in violation of Title 26 U.S.Code Ann. § 4704(a).

The parties were subsequently indicted; the trial court sustained a motion on behalf of Lozano to suppress the fruits of a search of the hotel room into which the parties had registered as man and wife but overruled the similar motion made on Miss Montoya's behalf; thereupon, the government dismissed the cases against him but proceeded to try the woman; during the course of the trial the fruits of the search of the room were introduced into evidence together with a confession which she made. She is here complaining of error in the trial court's overruling of the motion to suppress the packages of cocaine which were found in the hotel room and the trial court's order denying the motion to suppress her alleged confession.

The basic facts relating to the search and the taking of the statement from Miss Montoya were undisputed.

On the Avianca Airlines flight 56, arriving from Bogota, Colombia at 12:00 noon in Miami, April 2, 1967, Lozano and Miss Montoya and a third party, Sanchez Pineda, debarked and Sanchez was detained by customs officials. Lozano and Miss Montoya proceeded immediately to the Miami Colonial Hotel in downtown Miami, where they arrived at 12:22 P.M. Upon searching Sanchez, the customs agents found four packages of pure cocaine on his person. Thereupon, customs agents proceeded immediately to the hotel, ascertained that Lozano had checked in for himself and Miss Montoya as Mr. and Mrs. Lozano. Thereupon, they went upstairs and waited approximately a half hour outside the room shared by the couple. When Lozano came out the agents talked briefly with him and then entered the room with him, explaining to the trial court in response to the motion to dismiss, that they had the right to enter it as a "border search." Thereupon, Lozano and Miss Montoya were questioned by the agents, who first obtained from them their passports, immigration forms and airline tickets. Then they stated to Lozano and Miss Montoya that they had information that they had not declared everything and asked

whether this was true.[1] Upon receiving a denial, they then requested permission to search the *baggage*, which was given. They found nothing in the baggage, whereupon they began to search the room without asking or receiving consent. Up over the brace in top of one of the drawers of the dresser, they found four packages of cocaine. They thereupon notified the two parties that they were under arrest, and they then called for a customs agent named Minas, who spoke Spanish fluently.

Agent Minas sought to question the two individuals, which he said was not successful. He said, "I tried to talk to each one of them, but it was rather strained. We could not do anything." Thereupon, he ordered Lozano taken from the room and undertook to question Miss Montoya. In view of appellant's attack on the admissibility of the statements she made in response to this questioning, it is necessary that the nature of the warning given by him be carefully stated. The relevant testimony respecting this is as follows:

"A. I advised Miss Montoya of the fact that she was under arrest and made sure she understood that she was under arrest. Then I explained to her her rights under the Constitution.

"Q. Specifically, what rights did you advise her of at that time, sir?

"A. I told her that under the Constitution of the United States, she had the right to remain silent, that anything she might say could be used against her if she was tried. I also told her she had a right to an attorney, and, if she could not afford an attorney, one would be provided for her. I also told her she could terminate the interview at any time she so desired.

"Q. After you advised her of these rights, what, if anything, did she say to you?

"A. She acknowledged. * * * I asked her if she understood, and she

acknowledged she did by shaking her head."

Thereupon, Miss Montoya answered questions, as a result of which she admitted that she had brought four packages of cocaine into the country and had placed them on the dresser. She denied that she had concealed them in the place where they were found.

Under cross examination, the following transpired, dealing with the separation of Lozano and Miss Montoya before the questioning of the latter:

"Q. Mr. Minas, when you saw Miss Montoya in the room when you talked with her and Mr. Lozano, you tried to elicit at that time a confession; is that right?

"A. I asked them certain questions.

"Q. You tried to elicit some questions?

"A. I asked them certain questions, yes.

"Q. They refused to answer you, did they not?

"A. They were closed-mouth, yes.

"Q. You tried very strenuously at that point and you saw you were getting no place with them; is that true and correct?

"A. Well, it wasn't strenuously, no sir. I wouldn't force them to say anything.

"Q. Mr. Minas, is it not true that you never advised them of any constitutional rights when they were jointly together?

"A. That is true, while they were jointly together.

"Q. At the time you saw you were getting no place with them, then you figured you had better separate them and maybe you would elicit information that way?

"A. I figured that would be the way to obtain some statements, yes."

---

1. One agent, Knierim, stated that he attempted to question them in Spanish, but that he was not proficient in that language. The Colombians did not speak English.

Based on this testimony, the trial court concluded that the entry without a search warrant was not legal as a "border search" and ruled out the proof of anything that occurred in the room *as against Lozano,* but refused to suppress the evidence as to Miss Montoya. He then permitted the case to go to trial against her, charging that it was for the jury to decide whether she had understood the warning as to her constitutional rights. The trial court admitted in evidence the narcotic packages which were found as a result of the search which it held to have been illegal as against Lozano. The court also submitted to the jury the question as to the voluntariness of Miss Montoya's inculpatory statement. The jury convicted her on two counts.

 We conclude that on the showing thus made it was the duty of the trial court to suppress both the narcotics and the confession elicited from the appellant.

The four packages of narcotics were found from a search of the room occupied jointly by Lozano and Miss Montoya, both of whom were authorized by the registration to be in possession of the premises. Under the rule enunciated by the Supreme Court in the case of Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, Miss Montoya had as much "standing" to resist illegal entry into the hotel room as did her companion Lozano. It is difficult for us to understand how the trial court failed to apply to her the same right to suppress the fruits of the illegal search as it did in ordering the evidence suppressed as to Lozano. Moreover, but for the illegal entry and the discovery of the narcotics upon the search of the premises, not further authorized by either Lozano or Miss Montoya, it is highly questionable that the officers would have succeeded in overcoming her first denial that she had brought anything into the United States that had not been properly declared. It was only after the articles were discovered by searching the bureau drawer that they placed her under arrest and be-

gan the questioning that ultimately elicited the inculpatory statements used against her.

In *Jones,* supra, the trial court said:

"We are persuaded, however, that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures, subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. * * * Distinctions such as those between 'lessee,' 'licensee,' 'invitee' and 'guest,' often only of gossamer strength, ought not to be determinative in fashioning procedures ultimately referrable to constitutional safeguards. * * * As petitioner's testimony established Evans' consent to his presence in the apartment, he was entitled to have the merits of his motion to suppress adjudicated."

As we read the record here, the trial court's refusal to grant the motion to suppress in favor of Miss Montoya, was the simple fact that "she had not signed the register." Even if Lozano's signing her in as a joint occupant of the premises were not sufficient, nevertheless the clear evidence that she was his "guest" in the room is adequate to bring her within the Jones rule.

 Now, as to the statement made by Miss Montoya in response to the questioning. The confession by her in this case is fatally defective under Miranda v. State of Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694. In *Miranda* the Supreme Court said:

"Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer *and to have the lawyer with him during interrogation* under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that any-

thing stated can be used as evidence against him, *this warning is an absolute prerequisite to interrogation.* No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right." 384 U.S. 436, 471–472, 86 S.Ct. 1602, 1626. (Emphasis added.)

Here, with a foreign person unable to speak English, being interrogated in her hotel room which had been entered without her permission, by several United States government officials, and who was put under arrest upon the discovery of the packages of narcotics as a result of an illegal search, we find one official giving her a partial "Miranda" warning. The trial court stated, when government counsel was unable to understand in what respects Mr. Minas' warning was inadequate, "I can tell you several things. First, he did not advise her that she had a right to consult an attorney before she made any statement. That is one of the worst things he had not advised her about." Nevertheless, because Mr. Minas said that after he gave her the warning which he did give, she indicated "by shaking" (later changed to "nodding") her head that she understood her constitutional rights, the trial court denied the motion to suppress.

Aside from the fact that it is difficult to understand how a person under such circumstances, a stranger in this country and not shown to be familiar with the American constitutional system, could be assumed to understand rights that were not even explained to her, we must hold that an express statement that the person questioned "has the right to consult with a lawyer and to have the lawyer with him during interrogation." is "an absolute prerequisite to interrogation." As stated in *Miranda,* "No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead." (Supra.)

As pointed out above, the trial court concluded that there was a failure to warn Miss Montoya of the right to have counsel provided for her before making the statements. Nevertheless, the trial court said, "That is not sufficient, and I condemn the card system, if that is what you have on the card, as being insufficient. However, I am going to rule that he did sufficiently advise her and let the jury make a determination of that in this case."

There is no issue here that could be decided by the jury that would obviate the requirements which we have delineated. The grant or denial of constitutional rights, once a *fact* of denial has been ascertained, as it was by the trial court here, cannot be permitted to be merged into a general verdict of guilt or innocence by a jury.

The judgment is reversed and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.