**UNITED STATES of America,**
**Appellee,**

v.

**Vincent PACELLI and Demetrios**
**Papadakos, Appellants.**

**Nos. 288, 328, Dockets 72–1709, 72–2088.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 20, 1972.

Decided Nov. 30, 1972.

Rehearing Denied Jan. 2, 1973.

Certiorari Denied March 19, 1973.
See 93 S.Ct. 1501.

E. Barrett Prettyman, Jr., Washington, D. C., for appellant Pacelli.

Elliot A. Taikeff, New York City, for appellant Papadakos.

John M. Walker, Jr., Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., Kenneth Feinberg and John W. Nields, Jr., Asst. U. S. Attys., of counsel), for appellee.

Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Appellants Vincent Pacelli and Demetrios Papadakos were found guilty after a jury trial in the United States District Court for the Southern District of New York, Milton Pollack, *Judge*, of conspiring to distribute narcotic controlled substances in violation of 21 U.S.C. §§ 812, 841. Pacelli was also found guilty on three substantive counts of a five-count indictment.[1]

Appellants claim that Rule 4 of the Second Circuit's Rules Regarding the Prompt Disposition of Criminal Cases requires dismissal of the indictment and that admission of an out-of-court post-arrest statement of a government witness who disclaimed the statement in court denied them due process and violated the federal hearsay rules. Appellant Pacelli additionally claims that the admission of a quantity of boric acid into evidence violated his Fourth Amendment rights. Appellant Papadakos claims that indictment and trial in this case put him in jeopardy for a conspiracy to which he had already pleaded guilty. For the reasons given below, we find no merit in any of these contentions, and we affirm.

On May 5, 1971, Agent John Lepore of the Bureau of Narcotics and Dangerous Drugs first met Elisa Possas, a trafficker in drugs and appellant Jimmy Papadakos' girlfriend. Possas gave Lepore cocaine to sample and procured for him a quantity of better quality. Possas assured Lepore that she could obtain pure heroin from her boyfriend and source, Papadakos. She refused, however, to introduce the agent to Papadakos until she knew him better and had completed the cocaine deal with him.

On May 20, Lepore again met Possas. She showed him a sample ½ kilo of heroin. They agreed upon a purchase price of $14,000.[2] That night Lepore met Possas ostensibly for a dinner date and to pay her for the heroin. When she indicated that Pacelli would not allow her to take Lepore to see him to complain about the quality of heroin sold to the agent, Lepore signaled other agents and Possas was arrested.

Warned of her rights, Possas was taken to the stationhouse where, according to the testimony of Agent Devine, she agreed to cooperate. She signed a state-

---

1. Counts III and IV charged him with distribution and possession with the intent to distribute heroin and cocaine; Count V charged use of communication facilities in the course of the heroin distribution.

2. In response to Lepore's question about the source of the heroin, Possas said it came from "Vinnie the Italian." She did not know his last name but said that she had been invited to his wedding and could get his name from the wedding invitation. Possas explained that Vinnie and her boyfriend Papadakos were partners in a heroin distributing ring which supplied customers from Chicago and Detroit. Upon Lepore's request that she call Vinnie, Possas dialed a number registered to Beverly Jalaba, Vinnie's fiancee. She said, "Hello, Vinnie, this is Lisa. My man will take the half," and "Okay, I will see you later." Lepore called Possas at home later that day to get Vinnie's last name. Possas checked the invitation and told Lepore that it was Pacelli.

ment which explained her rights and then gave a statement to the officers identifying Pacelli and Papadakos as her suppliers. The statement was typed by Agent Devine and represented a summary of her information. She initialed the changes she made in reading over the typed summary and signed the statement. Possas and several agents then returned to her apartment to make a call to Pacelli. The call was answered by Jalaba who spoke with Possas about a wedding dress; Possas told the agents that "wedding dress" was a code word for heroin.

Several hours later, agents went to Jalaba's apartment to arrest Pacelli. Those in the apartment initially refused to open the door upon the agents' announcement of their arrival and purpose. After a few minutes, during which time the officers heard the rattle of the venetian blinds and a toilet flushing, the door was finally opened. Pacelli was placed under arrest and warned of his rights. An agent outside the building saw a package thrown from the apartment window. He reported to the arresting officer who, after seeing the package which contained four bags of cocaine, placed Jalaba under arrest and warned her of her rights. Later that afternoon the apartment was searched for heroin pursuant to a search warrant. Among the items seized was a container of boric acid found in a shopping bag in the kitchen which contained 30–40 other tins of the acid.

Papadakos was arrested on May 27, 1971.

At trial, the government called Elisa Possas, who had pleaded guilty to Counts I, II, III and V of the indictment. She denied knowing Pacelli, denied that either Pacelli or Papadakos was her source, and repudiated the statement given to the police, claiming that she signed it thinking it to be deportation papers. She testified that while at the stationhouse she was high on drugs, that she was terribly upset and talking wildly. The government then introduced the content of the statement through the testimony of Agent Devine.

After the government's case, the court dismissed the charge against defendant Jalaba for lack of evidence. The jury returned a verdict of guilty against Pacelli on Counts I, III, IV and V, and innocent on Count II which charged distribution of cocaine to West, a government informer on May 3. Papadakos was found guilty on the conspiracy count and acquitted on substantive Count III.

■ The government filed its notice of readiness on November 12, nine days before the six-month period allowed under the Second Circuit's Rules Regarding the Prompt Disposition of Criminal Cases expired, requesting ten days notice of trial date. The court correctly held that the speedy trial rules were not violated, since the government had timely declared its readiness and the ten-day notice requested by the government was not binding on the court. The court could have called the parties to trial without the ten-day notice.

■ The admission of Possas' post-arrest statement was not reversible error. Appellants make no claim that its admission violated their Sixth Amendment right to confront witnesses against them, since Possas was on the stand ready to testify. California v. Green, 399 U.S. 149, 158–159, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Nor was there any violation of due process in admitting Possas' unsworn statement into evidence. As in *Green, supra*, breach of the evidentiary hearsay rule did not result in a *per se* violation of due process. There was substantially identical evidence in the record here to support appellants' conviction. The essence of the post-arrest statement was introduced through Agent Lepore's testimony concerning Possas' statement made to him during the conspiracy. Possas' telephone call to a number registered to Pacelli's fiancee with whom Pacelli was living, the statement of Possas to Pacelli that her man wanted the "stuff" was

some evidence connecting Pacelli with the conspiracy. Evidence of the drugs seized at the time of appellant's arrest and the subsequent search of Jalaba's apartment furnished additional support for the statements made concerning Pacelli's involvement in the narcotics business.

■ Failure to prove infringement of his constitutional rights, however, does not of itself dispose of Pacelli's claim. Violation of the hearsay rule, if prejudicial, might also support reversal. Admission of Possas' statement without instructions to the jury limiting its use to the issue of credibility violated the hearsay rule as applied in this circuit.[3]

■ The statement might properly have been admitted for a limited purpose; Possas failed not only to help the prosecution but testified against the government's case. In the face of her testimony that she neither knew the defendant nor received drugs from him, the government could use her prior statement to impeach her as a witness. Taylor v. Baltimore & Ohio R. R., 344 F.2d 281, 283–284 (2d Cir.), cert. denied, 382 U.S. 831, 86 S.Ct. 72, 15 L.Ed. 2d 75 (1965). The permissible effect was merely to cancel out the unexpected contradictory testimony made on the stand. Error therefore was made not in the admission of the statement but in the court's failure to give proper limiting instructions.

■ Review of the record, however, leads us to conclude that the error in this case was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 26, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Agent Lepore had already testified as to the substance of the statements incriminating the appellant made by Possas prior to Possas' arrest; these statements made in furtherance of the conspiracy could be used substantively against the defendant. The court was quite correct in thinking futile and unnecessary an attempt to erase from the jury's mental slate one of two substantially identical pictures. Moreover, the telephone call to Pacelli and the drugs found in Jalaba's apartment all strongly support conviction.[4]

■ Relying on United States v. Dzialak, 441 F.2d 212 (2d Cir.), cert. denied, 404 U.S. 883, 92 S.Ct. 218, 30 L. Ed.2d 165 (1971) and United States v. LaVallee, 391 F.2d 123 (2d Cir. 1968), appellant Pacelli argues that seizure of boric acid, a diluent for cocaine, under a search warrant specifying only heroin, was violative of his Fourth Amendment rights. Appellant misconceives the import of the Supreme Court's decision in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Both the majority and dissenters found that where a police officer has a warrant to search a given area for specified objects, and in the course of the search comes across some other article of incriminating character, the property is seizable under the plain-view doctrine. 403 U.S. at 465, 514–516, 91 S.Ct. 2022.

The determinative factor in all plain-view seizures is "that the police officer . . . had a prior justification for an intrusion in the course of which he came *inadvertently* across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure." *Coolidge, supra,* at 466, 91 S.Ct.

3. This court expressly refused only last term to anticipate the proposed Federal Rules of Evidence (801d) or to expand its exception to the hearsay rule enunciated in *Desisto* as the government again asks us to do. United States v. Briggs, 457 F.2d 908, 910 (2d Cir. 1972) ; United

States v. Cunningham, 446 F.2d 194, 198 (2d Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 302, 30 L.Ed.2d 266 (1971).

4. Appellant Papadakos adopted the arguments advanced on this issue by Pacelli. Our rulings as to Pacelli apply as well to Papadakos.

at 2038 (emphasis supplied). Seizure of mere evidence as well as instrumentalities or contraband is justified under the doctrine. *Coolidge, supra,* at 464, 91 S. Ct. 2022. In the case at bar narcotics agents entered appellant's fiancee's apartment under the authority of a properly executed search warrant. The warrant specified the ½ kilo of heroin Possas had informed Lepore would be there. While searching for the heroin which was not found, the officers came upon 30–40 tin containers of boric acid, a diluent of cocaine, in a shopping bag in the kitchen. The agents had entered looking for heroin; they found a large quantity of boric acid—incriminating evidence of illegal drug activity. There is no evidence to show prior knowledge of the boric acid or its location, nor of any intent to seize such evidence prior to its being found. Under *Coolidge* the search was reasonable.[5] The boric acid, seized in a search for heroin, was obviously relevant evidence of a closely related drug activity and properly subject to seizure, especially in light of the cocaine found at the scene of the arrest earlier that morning.

A more than four-hour ransacking search of appellant's apartment for any possible incriminating evidence required reversal in United States v. Dzialak, 441 F.2d 212 (2d Cir. 1971). Police in that case had a search warrant for 27½ pairs of hosiery, a bicycle and a carton of binoculars, items believed to have been stolen. They seized a bike, five boxes of hosiery, twelve pieces of telescope equipment, twenty-one Timex watches and five shipping papers to the watches. While finding that the optical equipment was sufficiently covered by "binoculars" in the warrant, the court held that the Timex watches were the fruit of a general search proscribed by the Fourth Amendment. 441 F.2d at 216–217. There is no evidence of such a ransacking general search of Jalaba's apartment; the boric acid was found in a shopping bag in plain view in the kitchen.[6]

As the evidence seized was material and incriminating, and found in plain view within the scope of a limited search for heroin under authority of a properly executed search warrant its sei-

---

5. Nor are our decisions in *LaVallee* and *Dzialak* to the contrary. The question of the constitutionality of seizure of unspecified property unexpectedly discovered in the course of a lawful search which is reasonably related to the purpose of the search was expressly left open in United States v. LaVallee, 391 F.2d at 127. In that case, newspaper clippings concerning burglaries were seized under authority of a warrant to search for various machines and paraphernalia used by a licensed locksmith which property was in violation of § 408 of the Penal Law. Reversing the conviction, the court focused on the nature of the evidence seized, observing that "[t]here is no evidence that anything which was mentioned in the newspaper clippings concerned anything said or done by [defendant]; and they were certainly not contraband which would show that another, different offense was being committed in the presence of the police. . . . The clippings are at best of dubious evidential value and, standing by themselves, would be a highly questionable subject for issuance of a search warrant." 391 F.2d at 127.

6. Both United States v. LaVallee and United States v. Dzialak cite Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927) for the proposition that items not specified in a search warrant may not be seized under its authority.

The Supreme Court's decision in *Coolidge* casts doubt upon the continuing validity of such reliance. In his dissent, Justice White observes, "I have my doubts that . . . *Marron* can survive later cases in this Court. . . . Apparently the majority agrees, for it lumps plain-sight seizures in such circumstances along with other situations where seizures are made after a legal entry." 403 U.S. at 515, 91 S.Ct. at 2062. The majority, however, while allowing seizures of unspecified objects pursuant to a warrant, apparently does not consider *Marron* overruled. The Court uses *Marron's* result upholding the seizure of ledgers not specified in a search warrant as an example of its inadvertence rule.

zure was reasonable and its admission into evidence proper.

Appellant Papadakos raises his earlier plea to a second indictment before Judge Gurfein as a bar to prosecution under the indictment in this case, claiming that the same crime is the subject of both indictments. The earlier indictment, the one now at issue, charged appellant with conspiracy to possess for distribution and distribution of narcotic substances; violation of the same law, §§ 812 and 841 of Title 21 of the United States Code, was charged in the second indictment. Appellant relies on the identity of the offense charged and an overlap of seventeen days in the two charged conspiracies to show that the agreements were not separate and distinct but rather one overall conspiracy. Offenses for the purposes of double jeopardy must be the same in law and in fact. Dryden v. United States, 403 F.2d 1008, 1009 (5th Cir. 1968). They were not the same here. Although the times alleged in the indictment here overlapped, the facts proved occurred in two separable periods, three months apart.

Offenses are not the same merely because they arise out of the same general course of criminal conduct; "they are the 'same' only when 'the evidence required to support a conviction upon one of them [the indictments] would have been sufficient to warrant a conviction upon the other.'" United States v. Kramer, 289 F.2d 909, 913 (2d Cir. 1961). While the two indictments charged the same type of crime, the only common conspirator was the appellant, moreover the overt acts charged in each indictment were entirely different, some indication of lack of identity.[7]

Appellant urges that the proper test is that used in Short v. United States, 91 F.2d 614, 621 (4th Cir. 1937), in which the court rejected reliance on overt acts alleged and focused instead on whether it appeared that the government had merely carved one larger conspiracy into smaller, separate agreements. Even on this test, however, the record clearly demonstrates that this was not the case here. Arrest and charges under the first indictment were made before the actions alleged in the second indictment even took place. There is nothing indicating any connection between the parties or agreements of the May and August transactions. At the time of his plea, appellant himself did not consider the offenses the same under the two indictments, pleading guilty to those crimes charged in the second but steadfastly maintaining his innocence as to those in the first. The court did not err in its refusal to grant an evidentiary hearing on Papadakos' claim of double jeopardy.

Appellant Pacelli's challenge to the admission of his statement of ownership of the cocaine thrown from Jalaba's window on the grounds that he was not informed of his right to the presence of an attorney, is answered by this court's decision in United States v. Lamia, 429 F.2d 373, 377 (2d Cir.), cert. denied, 400 U.S. 907, 91 S.Ct. 150, 27 L.Ed.2d 146 (1970). The arresting officer warned Pacelli that he had a right to remain silent, that he did not have to make any statements to the officer, that he had a right to an attorney and that if he couldn't afford one the court would appoint an attorney for him. The instructions fully informed appellant of his rights.

Judgment affirmed.

---

7. *Compare*, Ferracane v. United States, 29 F.2d 691, 692 (7th Cir. 1928); Henry v. United States, 15 F.2d 365 (1st Cir. 1926).