STATE of Alaska, Petitioner,

v.

Daniel CASSELL, Respondent.

No. 4342.

Supreme Court of Alaska.

Sept. 13, 1979.

---

Mary Anne Henry, Asst. Dist. Atty., Anchorage, Joseph D. Balfe, Dist. Atty., Avrum M. Gross, Atty. Gen., Juneau, for petitioner.

Ronald T. West, Anchorage, for respondent.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

RABINOWITZ, Chief Justice.

We granted the state's petition for review of the superior court's ruling that a confession made by Daniel Cassell was unlawfully obtained and therefore inadmissible at Cassell's trial.

Daniel Cassell's adopted father, Air Force Colonel Robert Cassell, was bludgeoned to death in his Eagle River apartment on the night of August 14, 1978. After his body was discovered the following day, the Alaska State Troopers began an investigation, and, on the afternoon of August 15, 1978, Investigator Smith questioned Daniel Cassell as to any information he had concerning his father's death. Evidence obtained in the ensuing investigation indicated that Daniel Cassell had recruited and paid two juveniles to kill his adopted father and, on August 18, 1978, a warrant was issued for Cassell's arrest for inciting the commission of this crime in violation of AS 11.10.070.[1]

---

1. AS 11.10.070 provides:

    *Inciting commission of crime.* A person who wilfully and knowingly solicits, incites or induces another to commit a felony or misdemeanor in the state, (1) if the act solicited, incited or induced is a felony, is guilty of a felony and upon conviction is punishable by a fine of not more than $3000, or by imprisonment for not more than three years, or by both; (2) if the act solicited, incited or induced is a misdemeanor, is guilty of a misdemeanor and upon conviction is punishable by a fine of not more than $500, or by imprisonment for not more than six months, or by both.

The grand jury subsequently returned an indictment against Daniel Cassell on August 25,

That afternoon, Alaska State Troopers Joseph Hoffbeck and Joseph Hildreth drove from Anchorage to Eagle River to arrest Cassell, arriving there at approximately 3 p.m. They identified themselves as troopers and Trooper Hoffbeck asked Cassell to accompany the troopers back to Anchorage "to clear up some matters and so I might talk to him." While the troopers did not serve Cassell with the arrest warrant or otherwise formally arrest him, they testified that they considered Cassell to be in their custody and that they would have formally arrested him had he refused to accompany them.

Cassell got into the patrol car for the drive to the police station in Anchorage. Once in the car, the troopers began an interview with Cassell, which they tape recorded. At the outset of this interview, Trooper Hoffbeck, who was driving the patrol car, asked Cassell if he had been informed of his *Miranda* rights [2] by Investigator Smith three days earlier at the time he was first questioned in connection with the homicide.[3] Trooper Hoffbeck then advised Cassell of his *Miranda* rights from memory as follows:

Q. Okay, you know that you have the right to decide that you don't have to say anything did he advise you of that? I'd like to tell you that now because you don't have to talk to us if you don't want to. If you do decide to talk to us or make any statements it can be used against you in a court do you understand that?
A. Yes.
Q. And that you have a right to have an attorney and if you cannot afford to have an attorney one could be arranged to be appointed for you. Does that make sense what I've been telling you?
A. Ya.

The trooper testified later at the suppression hearing that he had a "*Miranda* card" [4] in his wallet at the time Cassell was taken into custody, but he did not read from it to advise Cassell of his rights.[5] Officer Hildreth, who was sitting in the back seat of the Patrol car during the drive from Eagle River to Anchorage and operating the tape recorder, did not read Cassell his rights directly from a *Miranda* card or relate them to him from memory.

The interrogation continued at the trooper station after the troopers and Cassell arrived in Anchorage, and certain state-

1978, for the offense of first degree murder. AS 11.15.010 provides:
  *First degree murder.* A person who, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate, rape, arson, robbery, or burglary kills another, is guilty of murder in the first degree, and shall be sentenced to imprisonment for not less than 20 years to life.

2. The *Miranda* requirement that a suspect must be warned of his constitutional rights before custodial police interrogation begins was first articulated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. The transcript of the tape-recorded interview of Cassell in the patrol car indicates that Cassell responded "ya" to the query about the prior reading of his *Miranda* warnings. However, Cassell testified at the suppression hearing that Investigator Smith had not read him his rights, but merely commented that there was no need to read Cassell his *Miranda* rights at that initial interview. Cassell's testimony was not contested on this point.

4. A "*Miranda* card" is carried by a police officer to facilitate advising suspects of their constitutional rights. The card which Trooper Hoffbeck carried read as follows:
    Miranda Warning
  1. You have the right to remain silent.
  2. Anything you say can and will be used against you in a court of law.
  3. You have the right to talk to a lawyer and have him present with you while you're being questioned.
  4. If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish.
  5. You can decide at any time to exercise these rights and not answer any questions or make any statement.

5. The defense attorney further questioned Officer Hoffbeck about his use of the *Miranda* card:
  Q. Do you use that card which you read from whenever you arrest someone?
  A. Not all the time, sir, no.
  Q. Just as long as what's on the card is what they get, if it's verbal?
  A. Yes, sir.

ments were obtained which defense counsel subsequently moved to suppress. At the hearing on the suppression motion, Cassell's attorney contended that the *Miranda* rights he was given in the car during the drive from Eagle River to Anchorage were inadequate and that, therefore, the statements made by Cassell during the interrogation were unlawfully obtained. After hearing testimony and oral argument on the motion, the superior court suppressed the statements made by Daniel Cassell during the August 18, 1978, interview.[6]

The state then brought this petition for review seeking reversal of the superior court's ruling that the *Miranda* warning was insufficient, and Cassell's trial was stayed pending the outcome. We granted the petition for review because of our conviction that it involves "a controlling question of law as to which there is substantial ground for difference of opinion" and "immediate and present review . . . may materially advance the ultimate termination of the litigation."[7] Further, the question posed is of sufficient importance to justify our departure from the normal appellate procedure to give the issue our immediate attention.[8]

Whenever a question arises as to the adequacy of a *Miranda* warning in a given case, an initial inquiry is always whether it

6. In his oral decision to suppress the statements in question, the trial judge noted his numerous concerns about the police procedures followed in the August 18, 1978, interrogation of Daniel Cassell. Judge Rowland stated, in part:

> Specifically, I find that the *Miranda* warnings given at page 1 of the statement are inadequate, do not meet the requirements of *Miranda*. I have specified reference to the warning concerning his right to counsel which reads as follows: You have a—and that you have a right to an attorney and if you cannot afford to have an attorney one could be arranged to be appointed for you. It appears to me that clearly here it is a conditional appointment as stated by the officer and it does not appear to be an absolute right which should be conveyed to the defendant under *Miranda*, and furthermore, it appears that the appointment referred to is one which could be considered by the defendant to be in the future rather than presently for the purposes of the interview which was then ongoing. I also noted in reaching this decision that the defendant at page 2 was misled as to his arrest status. I do not find this dispositive or I did not consider it so. It may be, I did not find it dispositive, I did consider it. The defendant was clearly misled as to whether he was under arrest and he clearly was under arrest. It seems to me that if the defendant were to intelligently, voluntarily and knowingly to waive his constitutional rights, he must first of all understand the circumstances in which he finds himself. I also note that on page 6 and perhaps the most important exchange which took place insofar as my decision in this regard is concerned, at page 6 this is found, beginning at about the middle of the page I think it's important to note. Question: What time, 6:00, 7:00 o'clock? It doesn't do you any good to sit there and not answer, Dan, as hard as you wish I'm going to go away. Answer: I'm not wishing. Question: Huh? Do you remember when you left your house Monday night? Another apparent investigator: Hey, dummy, he's talking to you. Answer: Yeah, I know he's talking to me. Question: Do you feel like answering? Answer: No. Question: Are you sick? Answer: No, I'm not sick. Question: You should be fucking sick, you had your father killed. Answer: No, I didn't. It appears to me clearly that *Miranda* controls the situation. The defendant has indicated that he wished to discontinue the interview at that point in clear and unequivocal terms and the officers failed to heed his request at this time. It should be noted that at *Miranda* we find the following statement, that—at page 471 of that opinion [86 S.Ct. 1602]: It is an absolute prerequisite that the defendant be told that he has a right to consult with a lawyer and have the lawyer with him during the interrogation. Clearly the warning did not relay that information. It should also be noted that later on in the interview it's apparent that the defendant did not understand his rights and here we must refer to page 36 wherein it appears that the defendant was confused as to his right to an attorney. Furthermore, . . . the [*Miranda*] court makes clear that if at any time a subject indicates that he wishes to remain silent, the interrogation must cease and so clearly the page—the statement at page 6, at least this court finds, is dispositive. Reading the statement as a whole, one has to note that the interrogation techniques are specifically mentioned and discussed in *Miranda*. I needn't go farther.

7. Alaska R.App.P. 23(d).

8. Alaska R.App.P. 24(a). *See State v. Glass*, 583 P.2d 872, 874 n.1 (Alaska 1978), *opinion on rehearing*, 596 P.2d 10 (Alaska 1979).

was necessary for the interrogating officers to advise the individual being questioned of his constitutional rights. The state argues that Cassell was not in custody at the time he was questioned by Troopers Hoffbeck and Hildreth and that, therefore, it was not incumbent upon the officers to advise him of his *Miranda* rights.

In our recent decision in *Hunter v. State*, 590 P.2d 888 (Alaska 1979), we adopted an "objective, reasonable person perspective" for determining whether a person is in custody or otherwise significantly deprived of his freedom such that *Miranda* warnings are required.[9] The inquiry is to be made on a case-by-case basis, but the *Hunter* decision provides general guidelines for making the custody determination:

> '[I]n the absence of actual arrest [the inquiry is whether] something . . . [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates [to the defendant] that they would not have heeded a request to depart or to allow the suspect to do so.' This requires some actual indication of custody, such that a reasonable person would feel he was not free to leave and break off police questioning.[10]

As we noted in *Hunter*, three groups of facts are relevant to this determination of custody:

> The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.[11]

Applying this test to the present case, the following facts surrounding the interview with Cassell are significant. The state troopers had a warrant for Cassell's arrest in their possession when they drove to Eagle River to confront him, but it was not served upon Cassell until after he had returned to Anchorage with the officers and given them a statement. They called upon Cassell at the residence where he was staying and Trooper Hoffbeck asked him "if he would now accompany me to Anchorage to clear up some matters and so I might talk to him." However, both troopers testified that had Cassell refused to go with them in the patrol car "he would have been arrested at that time." Further, Trooper Hoffbeck testified that from the time Daniel Cassell was in his presence in Eagle River, "[h]e

---

9. *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979). In *Hunter* we quoted from the Supreme Court's discussion of "custodial interrogation" in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966), as follows:

> By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

590 P.2d at 893.

10. *Id.* at 895, *quoting United States v. Hall,* 421 F.2d 540, 545 (2d Cir. 1969) (footnote omitted), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970).

11. 590 P.2d at 895. A footnote to this discussion emphasizes that the final outcome of the interrogation is not by itself the determinative test for custody. We pointed out in *Hunter* that such an analysis might encourage the police to temporarily release a suspect after custodial interrogation to avoid the *Miranda* requirement. Further, "a court must determine whether the defendant was in custody when he made the incriminating statements; it is illogical to rest that judgment primarily on something that occurs after the defendant has made the statements." *Id.* at n.23.

was in my custody, he was not under arrest formally." [12]  Cassell was escorted to the police station by the two state troopers in a patrol car.  On the way to the trooper station he was given the warning which is the subject of this petition for review.  At the trooper station Cassell was taken directly to an interview room where he was interrogated for two and one-half hours by Troopers Hoffbeck and Hildreth and made incriminating statements. At the close of the interview Cassell was served with a copy of the warrant for his arrest.[13]

Collectively, these facts indicate custodial interrogation under the *Hunter* criteria set out above.  Cassell was asked to accompany the police officers to the police station for questioning;  he did not go there on his own initiative but was driven in a patrol car.  At the police station Cassell was questioned extensively in an isolated setting by two police officers using techniques described in the *Miranda* decision as the "friendly-unfriendly" or the "Mutt and Jeff" act.[14]  Both officers testifed that, in fact, Cassell was in custody and that he would have been formally arrested had he attempted to leave the officers' presence at anytime.  Under these circumstances, the testimony of the interrogating police officers that they gave no indication to Cassell that he was not free to leave and that he came with them freely is simply not determinative.  We conclude that a reasonable person, in the accused's position, would have assumed that he was not free to break off the interrogation and leave the officers' presence without their permission.  Therefore, we hold that Daniel Cassell was subjected to custodial interrogation and thus a *Miranda* warning was required.[15]

---

12. Defense counsel questioned Officer Hoffbeck about his failure to immediately present Cassell with the warrant for his arrest.

> Q.  I'm asking you why didn't you arrest him in Eagle River at the Scott residence since you had the warrant and he was there?
> A.  I think I answered that.  He came with me freely so I did not have to arrest him at that time.
>
> .    .    .    .    .
>
> Q.  Well, again, why didn't you just give him the warrant and read him his rights?
> A.  Well, for the main reason I wanted to talk to Mr. Cassell.
> Q.  Isn't it a fact that you rally wanted to get a statement from him.
> A.  Absolutely.
> Q.  And then you served the warrant?
> A.  That's correct.

13. Cassell was informed that he was under arrest at the police station as follows:

> Q.  This is your copy, it's a complaint, I've had it all along.  You were asking, you know, when we first got in the car if at that time you were under arrest.
> A.  Umhum.
> Q.  Technically at that time you were not.
> A.  Umhum.
> Q.  You could have told me at the house that you didn't want to come and talk with me and if you had of told me that, I'd have then informed you that I did have the warrant for your arrest.
> A.  Umhum.
> Q.  But since you weren't I'll have to officially now give you the copy of the complaint and a copy of the warrant and this is your copy and you read it here and in the car

coming in at the same time that you were asking if you were under arrest, I was telling you that about *Miranda* Rights, you know, that you didn't have to talk to us and the service of an attorney, is that correct.
> A.  Umhum.
> Q.  And what was your response to that, that you were—that you understood those?
> A.  Ya.
> Q.  Okay.
> A.  I mean, but this still means I get a lawyer, though, right.

14. *Miranda v. Arizona*, 384 U.S. 436, 452, 86 S.Ct. 1602, 1616, 16 L.Ed.2d 694, 711 (1966).  The *Miranda* decision further elaborated on the kind of interrogation situation in which *Miranda* warnings are required as follows:

> An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the [friendly-unfriendly] techniques of persuasion described above cannot be otherwise than under compulsion to speak.  As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.

*Id.* at 461, 86 S.Ct. at 1621, 16 L.Ed.2d at 716.

15. In reaching this conclusion we implicitly reject petitioner's alternative argument that on the facts of the present case an abbreviated *Miranda* warning was sufficient to apprise Cassell of his rights.  Citing *Rubey v. City of Fairbanks*, 456 P.2d 470 (Alaska 1969), for the

Since a *Miranda* warning was required in this case, we must next determine whether the warning delivered met the standards articulated in the United States Supreme Court's *Miranda* decision.[16] Cassell's contention in the superior court was that the warning he received differed significantly from the required standard; the superior court agreed with him and suppressed the statements made by Cassell during the interrogation.[17] In its petition for review, the state argues that the *Miranda* requirements were "substantially complied with." In particular, the state argues that Cassell was adequately informed of his right to counsel. We disagree, and thus affirm the holding of the superior court that the *Miranda* warning was insufficient.

Our analysis starts with the *Miranda* decision itself. That opinion explicitly articulates the importance of the right to have counsel present during interrogation:

> individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact. More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time.

*Miranda v. Arizona*, 384 U.S. 436, 468–69, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694, 720 (1966) (footnote omitted).

---

proposition that a warning is adequate if it "reasonably would have.left the impression in [Cassell's] mind . . . that questioning would have been deferred until he consulted an attorney," the state claims that a prior *Miranda* warning supplemented the one given. That is, even assuming the warning given by Officer Hoffbeck was insufficient, the two warnings taken together nevertheless adequately informed Cassell of his rights with respect to the period of questioning in the present case. The warning relied on was given four years earlier when Cassell was sixteen years old and was charged as a juvenile with a misdemeanor offense. Cassell testified that he did not recall his rights from this prior occasion.

While we recognize that in certain circumstances a suspect's actions in response to partial *Miranda* warnings may indicate his understanding of the constitutional rights involved, this is not such a case. *Compare Rubey v. City of Fairbanks*, 456 P.2d 470, 472–73 (Alaska 1969) (suspect not advised specifically of her right to have counsel present during questioning; however, she was told that she was entitled to an attorney, asked if she wanted to "call an attorney" prior to interrogation, and expressly stated in response to the question that she did not wish to call one; waiver of right to have counsel present during questioning was found) Cassell's prior contact with police authorities four years previously does not satisfy the *Miranda* requirement. Neither does Cassell's ambiguous comment at the close of the interrogation that "but this still means I get a lawyer, though, right" indicate his understanding of his right to counsel. *See* note 13 *supra*.

We take this opportunity, moreover, to express our disapproval of police reliance on a suspect's prior experience with *Miranda* warnings, given the ease and certainty of a renewed direct reading of *Miranda* rights to the suspect on the particular occasion for which they are required. As stated by the Supreme Court in the *Miranda* decision:

> The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in

16. *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–07 (1966), states:

> [U]nless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

17. The superior court's oral decision on the suppression motion is set out in part in note 6 *supra*.

The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process. A once-stated warning, delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowledge of their rights. A mere warning given by the interrogators is not alone sufficient to accomplish that end. . . . Even preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. Cf. *Escobedo v. State of Illinois,* 378 U.S. 478, 485, n. 5, 84 S.Ct. 1758, 1762. Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.[18]

In order to protect these significant interests of the accused in having counsel present during questioning, the Supreme Court in *Miranda* adopted the following standard for informing an individual of his right to counsel:

[W]e hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right.[19]

It is against this rigorous standard that we must judge the adequacy of the warning given in this case.

■ Cassell was informed "that you have a right to have an attorney and if you cannot afford to have an attorney one could be arranged to be appointed for you." Although we recognize that "the words of *Miranda* do not constitute a ritualistic formula which must be repeated without variation in order to be effective,"[20] we are nevertheless concerned that the substance of what the Supreme Court required in *Miranda* be imparted to a suspect undergoing custodial interrogation in clear, understandable language which a layperson can comprehend and on which one can knowingly act.

---

**18.** *Miranda v. Arizona,* 384 U.S. 436, 469–70, 86 S.Ct. 1602, 1625–1626, 16 L.Ed.2d 694, 721 (1966) (citations omitted). The *Miranda* opinion continues:

The presence of counsel at the interrogation may serve several significant subsidiary functions as well. If the accused decides to talk to his interrogators, the assistance of counsel can mitigate the dangers of untrustworthiness. With a lawyer present the likelihood that the police will practice coercion is reduced, and if coercion is nevertheless exercised the lawyer can testify to it in court. The presence of a lawyer can also help to guarantee that the accused gives a fully accurate statement to the police and that the statement is rightly reported by the prosecution at trial.
*Id.*

**19.** 384 U.S. at 471–72, 86 S.Ct. at 1626, 16 L.Ed.2d at 722.

**20.** *United States v. Vanterpool,* 394 F.2d 697, 698–99 (2d Cir. 1968). *See also United States v. Fox,* 403 F.2d 97, 100 (2d Cir. 1968); *People v. Gilbert,* 58 Ill.App.3d 387, 15 Ill.Dec. 956, 958, 374 N.E.2d 739, 741 (1978); *Sotelo v. State,* 264 Ind. 298, 342 N.E.2d 844, 847 (1976). *See generally Sleziak v. State,* 454 P.2d 252 (Alaska), *cert. denied,* 396 U.S. 921, 90 S.Ct. 252, 24 L.Ed.2d 202 (1969) (purpose of warnings required by *Miranda* is not to add a perfunctory ritual to police procedures but to inform accused persons of their right to silence and to insure a continuous opportunity to exercise it).

■ The *Miranda* warning given in this case falls short of this standard because it failed to advise Cassell of his present right to consult with an attorney and his right to have one appointed prior to questioning if he could not afford one. In addition, the warning did not clearly inform Cassell that he had the right to have counsel present with him during interrogation. These flaws in the *Miranda* warning are fatal to petitioner's case.

The state relies on *United States v. Lamia,* 429 F.2d 373 (2d Cir.), *cert. denied,* 400 U.S. 907, 91 S.Ct. 150, 27 L.Ed.2d 146 (1970), which is contrary to our holding here.[21] That court took a negative approach to the analysis, reasoning that since the defendant's "right to an attorney" had not been qualified in any way, Lamia reasonably should have understood that he had a right to counsel before answering any questions. A substantial body of case law supports this position.[22]

However, there is an equally impressive array of cases in support of our conclusion that the warning was inadequate. In *Goodloe v. State,* 253 Ind. 270, 252 N.E.2d 788, 791 (1969), for instance, the court held that a warning which only advised the defendant that the state would provide an attorney if she could not afford one was insufficient to meet the requirements of *Miranda* because:

At best, the warning merely advised the appellant that she had the right to counsel at *some time.* It did not expressly and clearly advise her that she had the right to the "presence" of a lawyer "during interrogation." [emphasis added][23]

A prior decision by our court also supports our holding that the *Miranda* warnings given to Cassell in this case were inadequate. In *Schade v. State,* 512 P.2d 907, 915 (Alaska 1973), the defendant was read the following warning:

Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.* If you wish to answer questions now without a lawyer

---

**21.** The warning given to the suspect in the *Lamia* case was substantially similar to that given in the case at bar. Lamia was told that "he had a right to an attorney, if he wasn't able to afford an attorney, an attorney would be appointed by the court." *United States v. Lamia,* 429 F.2d 373, 374–75 (2d. Cir.), *cert. denied,* 400 U.S. 907, 91 S.Ct. 150, 27 L.Ed.2d 146 (1970).

**22.** *See United States v. Floyd,* 496 F.2d 982 (2d Cir. 1973), *cert. denied,* 419 U.S. 1069, 95 S.Ct. 654, 42 L.Ed.2d 664 (1974); *United States v. Adams,* 484 F.2d 357 (7th Cir. 1973); *United States v. Pacelli,* 470 F.2d 67 (2d Cir. 1972), *cert. denied,* 410 U.S. 983, 93 S.Ct. 1501, 36 L.Ed.2d 178 (1973); *Eubanks v. State,* 240 Ga. 166, 240 S.E.2d 54 (1977). *Cf. United States v. Pheaster,* 544 F.2d 353 (9th Cir. 1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977) (defendant was aware of his right to the presence of counsel regardless of the content of the warning, but the court nevertheless cited *Floyd* and *Adams* with approval).

**23.** Other cases which strictly adhere to the *Miranda* mandate include: *United States ex rel. Placek v. Illinois,* 546 F.2d 1298 (7th Cir. 1976); *United States ex rel. Williams v. Twomey,* 467

F.2d 1248 (7th Cir. 1972); *South Dakota v. Long,* 465 F.2d 65 (8th Cir. 1972), *cert. denied,* 409 U.S. 1130, 93 S.Ct. 951, 35 L.Ed.2d 263 (1973); *Evans v. Swenson,* 455 F.2d 291 (8th Cir.), *cert. denied,* 408 U.S. 929, 92 S.Ct. 2508, 33 L.Ed.2d 342 (1972); *United States v. Noa,* 443 F.2d 144 (9th Cir. 1971); *Smith v. Rhay,* 419 F.2d 160 (9th Cir. 1969); *Gilpin v. United States,* 415 F.2d 638 (5th Cir. 1969); *United States v. Fox,* 403 F.2d 97 (2d Cir. 1968); *Atwell v. United States,* 398 F.2d 507 (5th Cir. 1968); *Lathers v. United States,* 396 F.2d 524 (5th Cir. 1968); *United States v. Vanterpool,* 394 F.2d 697 (2d Cir. 1968); *Montoya v. United States,* 392 F.2d 731 (5th Cir. 1968); *Groshart v. United States,* 392 F.2d 172 (9th Cir. 1968); *Windsor v. United States,* 389 F.2d 530 (5th Cir. 1968); *People v. Vigil,* 175 Colo. 373, 489 P.2d 588 (1971); *Burger v. State,* 242 Ga. 28, 247 S.E.2d 834 (1978); *People v. Prim,* 53 Ill.2d 62, 289 N.E.2d 601 (1972), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2731, 37 L.Ed.2d 144 (1973); *Burton v. State,* 260 Ind. 94, 292 N.E.2d 790 (1973); *Jones v. State,* 253 Ind. 235, 252 N.E.2d 572 (1969); *People v. Whisenant,* 11 Mich.App. 432, 161 N.W.2d 425 (1968); *State v. Fossen,* 255 N.W.2d 357 (Minn.1977).

present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer. [Emphasis in original]

Writing for the majority,[24] Justice Connor found this warning to be adequate. Significantly, the warning was distinguished from those discussed in cases from other jurisdictions which had held that the emphasized portion of the warning was contradictory and confusing on the basis that the warning in *Schade* specifically included both the right to have an attorney present during interrogation and a present right to a court appointed attorney if the defendant could not afford his own attorney.[25] Thus, we recognized in *Schade* the importance of informing the suspect that the right to counsel is a present right, not a right which attaches at some future indefinite time.

The *Miranda* warning given in the *Schade* case was substantially more complete than that given in the case at bar. Unlike the defendant in the *Schade* case, Cassell was not told that he was entitled to consult with an attorney before being asked any questions or that he had the right to have an attorney present with him during questioning. Furthermore, we think that the explanation of his right to have an attorney appointed for him if he could not

afford to hire one would have left the impression in a reasonable layperson's mind that the right was not unconditional but attached only at some time in the future.[26]

Our conclusion that the *Miranda* warning given to Cassell was inadequate makes it unnecessary for us to reach any of the other issues raised in this petition for review.[27] The statements obtained from Daniel Cassell in the August 18, 1978, interrogation were correctly suppressed by the superior court and we therefore sustain the superior court's ruling.

Affirmed.

BOOCHEVER, Justice, dissenting, with whom BURKE, Justice, joins.

I believe the *Miranda* warning given Cassell was adequate under the circumstances. I agree with the majority that:

Although we recognize that "the words of *Miranda* do not constitute a ritualistic formula which must be repeated without variation in order to be effective," we are nevertheless concerned that the substance of what the Supreme Court required in *Miranda* be imparted to a suspect undergoing custodial interrogation in clear, understandable language which a layperson can comprehend and on which one can knowingly act. [footnote omitted]

---

24. Four separate opinions were filed by the four justices participating in the *Schade* case. Two of these opinions expressed diverging views on the *Miranda* issue in the case. *See Schade v. State*, 512 P.2d 907, 920, 921 (Alaska 1973) (Boochever, J., concurring, and Rabinowitz, C. J., dissenting in part).

25. *Id.* at 915 n.12.

26. Cassell's confusion about his right to an attorney is apparent in his response to the interrogating officer's service of the warrant for his arrest at the close of the interview. Cassell stated: "I mean, but this still means I get a lawyer, though, right." *See* note 13 *supra*.

The *Schade* case is distinguishable on this point because the defendant there was told that he had a present right to consult with and be represented by an attorney. The additional language in the *Miranda* warning in that case to the effect that an attorney could not be appointed for him until he went to court "did not . . . dilute the meaning of the rights

set forth in the balance of the warning." *Id.* at 916. Absent the further warning that the right to counsel attaches prior to questioning regardless of whether appointed counsel is sought, the *Schade* decision clearly indicated that the warning in that case would have been insufficient. 512 P.2d at 915 n.12. *But see Harrell v. State*, 357 So.2d 643, 645 (Miss.1978) (recognizing that there exists a split of authority between some of the federal circuit courts, as well as several of the state courts, on the adequacy of such *Miranda* warnings; while approving a warning similar to that given in the *Schade* case, the court strongly recommended that peace officers delete the portion of the warning informing suspects that counsel can be provided "if and when you go to court" from future *Miranda* warnings).

27. Those alternative grounds for suppressing Cassell's statement were touched upon in the superior court's oral decision in this case, which is quoted in part at note 6 *supra*.

The majority concludes that the warnings were defective in that they failed to advise Cassell of his present right to consult with an attorney, his right to have one appointed prior to questioning and to have counsel present with him during interrogation. Under the circumstances under which the warnings were given, it seems to me that they could have conveyed no other meaning to Cassell, although admittedly, it would have been preferable had the officer read the full warning.

The substance of the warnings should be determined as of the time they were given, and they should be evaluated according to the meaning they would have reasonably communicated to Cassell. Cassell had not been placed under arrest, but had been asked to accompany the troopers back to Anchorage "to clear up matters and so I might talk to him." He had not been accused of a crime or advised that charges were being lodged against him. The warnings were given in the context of an investigatory questioning. Cassell was first informed:

Q. Okay, you know that you have the right to decide that you don't have to say anything did he advise you of that? I'd like to tell you that now because you don't have to talk to us if you don't want to. If you do decide to talk to us or make any statements it can be used against you in a court do you understand that?

A. Yes.

He was then told:

Q. And that you have a right to have an attorney and if you cannot afford to have an attorney one could be arranged to be appointed for you. Does that make sense what I've been telling you?

A. Ya.

The offer of an attorney could only relate to the questioning, not to some later unmentioned proceedings. It seems inconceivable to me that this simple warning could have been construed by Cassell as meaning that he would have the right to an attorney at some future unspecified time, but not in connection with the interview, which as far as he had been advised, was the sole reason he had been requested to accompany the officers.

In *Rubey v. City of Fairbanks*, 456 P.2d 470 (Alaska 1969), a majority of this court, with Justice Rabinowitz dissenting, approved a warning very similar to that involved in this case. Rubey, however, was formally arrested for the offense of assignation, after being apprehended immediately after completing an act of prostitution. We stated:

> *Miranda* does require that a defendant be warned of his right to the "presence of an attorney"—of the right to have "counsel present" during any questioning. But the fact that Tannenbaum did not specifically tell appellant that she had the right to have counsel "present" during questioning does not mean that she was not advised of her right in this respect. He told appellant, prior to questioning, that he was a police officer, that he intended to ask her questions in connection with her arrest, that she did not have to answer any questions, that anything she did say would be used against her, and that she was entitled to an attorney. He then asked her, also prior to interrogation, if she wanted to "call an attorney" and she answered "no."

*Id.* at 472 (footnote omitted).

While the inquiry pertaining to calling an attorney was not made specifically to Cassell, the circumstances of his questioning, in contrast to that of *Rubey*, clearly conveyed that the offer of counsel applied to the interrogation. Rubey, unlike Cassell, had been apprehended in flagrante delicto and placed under arrest. Unlike Cassell, absent the offer to telephone an attorney, she could arguably have understood that the right to counsel applied to future court proceedings.

It seems to me that requiring the additional formal incantations of *Miranda* under the circumstances involved in questioning Cassell elevates the words of *Miranda* to

the very ritualistic formula we have disapproved.[1]

1. Nevertheless, I recognize a tension between the desirability of police giving all of the elements of the *Miranda* warning in every case as a prophylactic against this very type of litigation. I certainly agree that the officers should be encouraged to avoid the loss of valuable evidence by reading the warning in its entirety and carefully assuring that the one investigated thoroughly understands each component of the warning.